Commonwealth *v.* Alessio, Appellant.

Argued December 5, 1933. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Vincent R. Smith* and *George H. McWherter,* for appellant.

*Paul K. McCormick,* Assistant District Attorney, with him *Victor B. Bouton,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MAXEY, January 2, 1934:

This is an appeal by Tony Alessio, who was convicted of the murder of Ralph Masco and sentenced to life imprisonment.

About 1 a. m., May 31, 1932, Ralph Masco was shot while sleeping in his bed in the front of the first floor of his residence in Monessen. He died two days later. His assailant had stood on the pavement or porch and fired several shots through the window at him. Within a short time after the shooting the defendant arrived at the scene of the crime and came into the room where Masco lay mortally wounded. Besides Masco, his wife and one or two others were also present. Defendant entered into conversation with these persons but no one then openly accused him of having fired the fatal shot.

Before defendant left the Masco home he was arrested by an officer who had seen him near the victim's house a short time before the shooting. Defendant first denied that he was near the scene at the time, but later admitted that he was. Alessio was tried twice and each time was convicted of murder of the first degree and the punishment fixed at life imprisonment. After the second conviction defendant again made a motion for a new trial which was refused by the court below, a dissenting opinion, however, being filed by President Judge COPELAND.

The testimony of the widow and an adult daughter and an eleven-year-old daughter of the deceased was ample if credited to sustain defendant's conviction. The substance of their testimony was that defendant had been a frequent visitor at their home; knew the location of the bed customarily occupied by deceased; on May 28, 1932, the deceased and defendant had a quarrel in the former's home over politics, that the defendant hit the table angrily and, as he left, said: "I'll get you"; that at 5 p. m. two days later defendant passed deceased's house in his car without speaking to any of the family sitting on the porch except to look at them and to "whisper"; about eight hours later Masco was shot, and he and his wife and eleven-year-old daughter who were all in the bedroom were awakened by the shooting, looked out the window and saw the defendant with a revolver, running toward his car which was standing across the street with the motor running and the door open; and shortly after he was shot the deceased came into the dining room, exclaiming, "Godfather has betrayed me!" (Alessio, the defendant, was godfather to two of the Masco children.) Their further testimony was that defendant appeared at the deceased's house within a short time after the shooting and said: "What's the matter, what's the matter?" and that his face was pale; that he directed or pushed Mrs. Masco into a room, slammed the door; that she then accused him of shooting her husband and he said: "That is nothing, that is nothing, shut up,

don't talk, otherwise I will shoot the whole family." A police lieutenant and a policeman both testified that defendant went into the room with Mrs. Masco and they heard him tell her to "shut up."

Mrs. Masco also testified that when Alessio drove away in his car she heard a "scratching" noise made by the automobile. The possible significance of this noise is indicated by the testimony of Sergeant Bunch of the state police, who, in examining defendant's automobile shortly after the homicide, found that both hub caps and the running board on the right side of the car were damaged. On the upper part of the curb opposite the Masco home he found that there was some small particles of metal. It was the contention of the Commonwealth that the metal clinging to the curb was from the hub cap of defendant's car.

The strength of the Commonwealth's case was substantially weakened by the fact that neither the widow nor the two daughters who testified at the trial against the defendant had made any accusation against him until many weeks after the homicide. Elizabeth Masco, the eleven-year-old daughter, admitted that she never told anyone who shot her father until about August 12th. She testified that the first person to whom she made an accusation as to her father's murderer was Attorney Mc-Kague, private counsel of the Commonwealth at the first trial of the case. The assistant district attorney who had charge of the prosecution testified that he did not know until at least a month after the homicide that there were any eyewitnesses to the shooting. Mrs. Masco testified that while she made a direct accusation of the defendant when she and he were alone in the room shortly after the shooting she did not make any accusation to the police officers. She testified: "I was afraid of the black hand."

The adult daughter, Mrs. Fannie Ostricio, testified that the defendant came to their home a very short time after the shooting "right after the two police," and that when he came in he said: "What's the matter?" and his

face was white, and Mrs. Masco said: "Who is going to support my kids?" He said: "Shut up, I will support the kids." She further testified that he took her mother into the bedroom where Masco had been shot, and that when defendant came into the room he whispered into the ear of Masco, who was then lying on the couch. She did not hear what Alessio said. She testified that on the night of the homicide she heard her father and mother say that Alessio had done the shooting. She was asked: "Why didn't you tell the police officers?" She answered: "We were afraid." She admitted that the first person to whom she told the story that her father and mother and sister were eyewitnesses to the shooting was Attorney McKague and this was several weeks after the event.

Defendant denied that there was a quarrel between him and Masco on either the Saturday or Sunday before the homicide. He testified that on the night of the homicide he was at the home of one Calderone until 12:20 a. m., and then he called at the home of one Orsiniak, and then got into his car to go to his home on McMahan Avenue, and that he saw "lots of people" outside the Masco house and he stopped his car and asked what was the matter. He went into the house and inquired of Masco who shot him but the latter said "he had no enemies, he don't know." He denied that he made any threats at that time to Mrs. Masco and denied that he did the shooting.

At the trial the Commonwealth agreed that the pistol found in defendant's room was not the pistol from which the fatal shot was fired.

Mrs. Mary Thomas, a sister of the deceased, testified that she was at the bedside of her brother about a half hour before he died, that he was conscious and asserted that Tony Alessio had done the shooting. She reported this to no one until she talked to Attorney McKague, three weeks after the homicide.

Theresa Murgie testified for the defense that she had lived with the Masco family since about two or three

weeks before the shooting, that she heard the conversation between the deceased and the defendant on Saturday, May 28th, and there was no quarrel between them. The following day she saw the defendant pass the Masco home and speak to the family sitting on the porch, and they responded to the greeting. She was awakened about one o'clock on the morning of May 31st by the shooting. She was sleeping in the basement of the Masco home and she rushed up the steps and saw Mr. and Mrs. Masco coming out of the bedroom, and Mrs. Masco said, "They shot us." She said that none of them named the person who did the shooting, that officers and a doctor were called. Later she saw the defendant when he arrived, and then Mrs. Masco "put her arms around his neck and said, 'Godfather, see what they have done to us.'" At that time Mr. Masco was lying on the couch. Defendant went to Masco and said, "What has happened?" Masco replied: "I don't know, I mind my own business, I don't bother anyone, I have been shot in bed while sleeping." The witness was then asked if anyone pointed to Tony Alessio as the guilty man. She answered: "No, they didn't." The same witness testified that when Masco was lying in his casket his widow "threw her handkerchief on the floor, there was a Saint hanging on the wall, she said, that Saint will get even for what they done to my husband—I will have to go to the police station and have him taken out." She was asked: "Who taken out?" to which she replied: "Tony Alessio." She also testified that after the funeral the family of Mrs. Masco discussed Tony Alessio and that she said she "didn't know if it was Tony Alessio." She testified that two days later Mrs. Masco said that "sometimes she thought it was Tony and sometimes she didn't think he would do such a thing."

The record thus presents conflicting testimony. If the story told on the stand by the Commonwealth's witnesses is true, the defendant's conviction was warranted. If the testimony of the defendant and his witnesses is true, he should have been acquitted. Conflicting testimony is al-

ways for the jury, but appellant contends that in submitting the case the trial judge should have instructed the jury to give preponderating weight to the exculpatory statements alleged to have been made by the husband and wife immediately after the shooting, rather than to the inculpatory statements alleged to have been made by him as a dying declaration and to the inculpatory statements made by her from the witness stand.

Appellant contends that the court should have affirmed his second request in the charge to the jury which was as follows: "The declarations of Ralph Masco, made at the time of the shooting, that he did not know who shot him, and the declarations of Mrs. Pauline Masco at the time of the shooting that she did not know who shot her husband, made in the presence of Elizabeth Masco, and undenied by her, hold a preponderance over, and are to be believed in preference to the alleged dying declarations of the deceased, and the testimony of Pauline Masco and Elizabeth Masco that they saw the defendant at, and fleeing from, the scene of the crime." Defendant also complains that there was error in refusing his fourth request in the charge to the jury, as follows: "Declarations made by Pauline Masco and Elizabeth Masco immediately after the shooting and at the scene thereof, made so soon after the shooting as to exclude the presumption that they are the result of premeditation and design, should raise such a reasonable doubt in the minds of the jury, as to the truth of subsequent contradictory statements, made by them as to work an acquittal." This request was obviously an instruction to acquit and to this the defendant was not entitled.

The court called the jury's attention to the fact that there was an inconsistency between the testimony of the mother and daughters on the witness stand and the statements they made immediately after the homicide and also an inconsistency between the statement alleged to have been made by the deceased immediately after the shooting and the alleged dying declaration he made

shortly before his death. The court quoted these contradictory statements and then said that it "cannot decide which statement is true; that responsible decision rests with the jury. But when contradictory statements are made by a witness, the jury should scan that testimony. The rule of evidence is, when a witness wilfully and corruptly makes a false statement to any material fact of the case, the jury are at liberty to disregard the whole of the testimony of that witness. The law goes no farther than to say that the jury may disregard the testimony. The court cannot instruct you what to do in such a case. We merely call your attention to this fact, because these contradictory statements are important in this case in deciding what conclusion you should come to."

On these instructions no error can be predicated. They were strictly in accord with what this court said in Danko v. Pitts. Rys. Co., 230 Pa. 295, 299, 79 A. 511: "If a witness at a former trial, or elsewhere, has made statements contradictory of his testimony at a second trial, such statements affect his credibility, but do not authorize an instruction to the jury not to believe him: Platz v. McKean Twp. et al., 178 Pa. 601 [36 A. 136]."

It would be judicial usurpation for a trial judge to instruct a jury that certain testimony "preponderates over and is to be believed in preference to" certain other testimony. When a statement is made from the witness stand which is at variance with an earlier statement made by the same person and an explanation is given as to why the earlier statement was made, the acceptability of this explanation is exclusively for the jury to determine. If the explanation impresses the jury as reasonable, they are at liberty to accept the later testimony. The duty of the trial judge in respect to the conflict in testimony was discharged when he gave the instructions quoted.

Wigmore on Evidence (2d ed.), volume V, section 2550, page 556, says: "They [the jury] are the triers of

the credibility and persuasive sufficiency of all evidence which is admitted for their consideration. But to hand the evidence to them, to be rejected or accepted according to some legal definition, and not according to its intrinsic value to their minds, is to commit a grave blunder." The same learned author, supra, in volume II, section 1044, page 501, after discussing the admissibility of evidence, says: "The impeached witness may always endeavor to explain away the effect of the supposed inconsistency by relating whatever circumstances would naturally remove it. The contradictory statement indicates on its face that the witness has been of two minds on the subject, and therefore that there has been some defect of intelligence, honesty, or impartiality on his part; and it is conceivable that the inconsistency of the statements themselves may turn out to be superficial only, or that the error may have been based not on dishonesty or poor memory but upon a temporary misunderstanding. To this end it is both logical and just that the explanatory circumstances, if any, should be received." Wigmore cites the case of State v. Reed, 62 Me. 146, in which DANFORTH, J., said: "The force of a contradictory statement must depend very materially upon the circumstances under which it was made and the influences at the time bearing upon the witness. It would therefore seem to be self-evident that witnesses so situated should be permitted to make such explanation as might be in their power. The first impulse of the mind in such a case is to inquire how this happened, what reason can be given, and more especially what can the party implicated say in excuse or extenuation."

It is reasonable to believe that fear might have been "the influence" to seal the lips of or to give temporarily deceiving tongues to the wife and daughters of the man who had just been shot down in cold blood in his bed by a midnight assassin. Each of them surely had ample reason to say as was said of old: "Fearfulness and trembling are come upon me, horror hath overwhelmed

me." Unfortunately there is no infallible device or institution to determine *when* witnesses or *what* witnesses are telling the truth. Trial by jury is the long-established and accredited institution for the trial of issues of fact. When a trial is free from legal error, a jury's verdict must be accepted, in the absence of after-discovered evidence which had hitherto escaped diligent search, until the institution of trial by jury is superseded by something better equipped to ascertain the facts and to discover the truth.

Complaint is also made of the admission of Masco's dying declaration. It is not necessary to discuss this as no exception was taken to the overruling of the objection to the admission of this declaration, but even if the question were properly raised, we would sustain the trial judge's ruling. The objection to the dying declaration is based upon the testimony of the physician who expressed the opinion that from one o'clock p. m. until Masco's death 45 minutes later, the declarant was incapable of making an intelligent statement. This physician did not see the deceased after twelve o'clock on the day of his death. His opinion is based entirely upon an examination of the deceased's hospital chart and he could not say whether Masco was intelligently conscious or not at the time the alleged dying declaration was made. Mrs. Masco and Mrs. Thomas both testified the deceased was conscious when he made the dying declaration. It was properly admitted.

Appellant also complains of the failure of the court to grant a new trial because the Commonwealth's representative in his argument to the jury suggested that the jury would be justified in convicting the defendant of murder in the first degree and imposing the death penalty upon him. It is contended that since the jury in the first trial imposed the penalty of life imprisonment, the jury in the second trial could not have imposed the death penalty, and therefore the district attorney at the second trial had no right to urge the imposition of the death

penalty. In view of the fact that the jury in the trial now under review did not impose the death penalty, the question is here only of academic interest. However, while it is true that a conviction of a lesser degree of homicide is in this Commonwealth construed as an acquittal of a greater degree of homicide, so that one having been convicted of a lessor degree cannot upon a new trial be found guilty of a higher degree, it does not follow that in a trial of defendant for murder after he has been found guilty of murder in the first degree and the penalty fixed is life imprisonment, the jury at the second trial of the same defendant for the same homicide cannot, in its discretion, as the Act of May 14, 1925, P. L. 759, provides, fix by its verdict the penalty as either death or life imprisonment. In all criminal cases except for murder in the first degree the penalty is, within certain limits, determined by the court, and in the second trial of such a criminal case, the court is not bound by its former sentence, but can if it so desires impose, within the limits prescribed, a more severe sentence than it imposed after the verdict in the first trial. What the court can do in all criminal cases in which the penalty is within its discretion the jury can do in the one case in which the penalty is within its discretion, that is, it can impose a higher penalty than the jury imposed in the first trial on the same indictment. See People v. Grill (Cal.), 91 Pac. 515.

No other alleged errors require discussion.

All of the assignments are overruled; the judgment is affirmed; and the record is remitted that the sentence may be carried out.