## Musleva, Appellant, *v.* Patton Clay Manufacturing Company (No. 1).

Argued March 26, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*Ralph F. Smith,* with him *Ernest G. Nassar* and *N. A. Malloy,* for appellants.

*Frank Barnhart,* with him *Reuel Somerville, Frank J. Hartmann* and *Barnhart & Adams,* for appellee.

OPINION BY MR. JUSTICE MAXEY, April 15, 1940:

Plaintiff brought an action in trespass against defendant company for damages for personal injuries resulting to him by reason of certain harmful gases emitted from certain mines. The mine located under the property of plaintiff was known as No. 3 Mine, and was operated by

the Patton Clay Manufacturing Company until 1932, after which date the operation was discontinued. Subsequent thereto, there were cave-ins of this mine and these were filled or partially filled by defendant with hot ashes, hot coke, cinders, and hot bitten or waste pipe, which, it is alleged, set fire to the crop coal in this mine and caused harmful gases to be emitted therefrom. These gases entered the house of plaintiff, causing him to be overcome and rendered unconscious from January 28, 1936, to January 31, 1936. It is also alleged that this caused plaintiff other physical illness of a substantial character. The negligence pleaded is that defendant allowed its abandoned mine to cave in and carelessly dumped into such cave-ins "hot ashes, hot coke, cinders and hot bitten or waste pipe." It is pleaded that "in dumping hot ashes" etc., over an outcrop of coal, they should have known that this would cause a fire which would produce dangerous and poisonous gases, "which they knew or should have known would enter plaintiff's home."

In the affidavit of defense it is averred, inter alia, that the alleged injuries complained of by plaintiff "have resulted by reason of a fire in an abandoned coal mine underneath or in close proximity to plaintiff's property. Said coal having been removed a number of years ago by one Karlheim, then owner of the property, and later by William Medlicott under lease from the Beech Creek Coal and Coke Company, then owner of the fee. And that pillars or stumps of coal were left standing in said mine. That fire gained access to said old coal mine or workings by reason of the burning of a public rubbish dump, used by residents of the Borough of Patton, which rubbish dump covered the entrance to the abandoned mine or workings of William Medlicott." It was also averred that the "rubbish dump was set on fire from time to time by children playing around the same, and by other persons unknown to the defendant, and over whom defendant had no control." Defendant further

averred that they did not own the land on which the rubbish dump was burning, that they did not at any time own or operate a mine to mine and remove coal from that land, "nor did they mine or remove coal from said abandoned mine or workings" and that defendant "in no manner contributed to the cause of said fire or the advance thereof." It is further averred by defendant that it "never at any time operated a coal mine under the property of the plaintiff, Steve Musleva, nor under property adjacent thereto." Defendant, however, admits that it did operate a clay mine on another property but that it discontinued the operation of this mine in 1932. Defendant denied that it filled cave-ins with hot ashes, hot coke, cinders and hot bitten or waste pipe.

The case went to trial and on conclusion of plaintiff's case, the court entered a compulsory nonsuit, which it subsequently refused to take off. This appeal followed.

The court stated in its opinion that there was not sufficient evidence of negligence on the part of the defendant company to go to the jury.

At the trial it was testified in behalf of plaintiff that the fire clay mine of defendant company ran up to within about ten feet of plaintiff's property line and that a watercourse had been driven entirely through the Mislevy property. This was the only clay mining that was done under that property. This watercourse was nine feet wide and eight feet high. The cover over the fire clay was about twenty feet in thickness at the Mislevy home. There was some outcrop coal near the Mislevy property, and there was evidence that there was some outcrop coal near the refuse dump of defendant company, and also that there were some openings at this point from the surface into the mine. Another witness testified that there were cave-ins of the clay mine a couple hundred feet from the Mislevy home. He said that he did not know whether the ashes dumped in these cave-ins were hot or cold, but that he did see lots of smoke coming up when they dumped the refuse in these holes.

Another witness testified that she saw smoke coming from the cave-ins along the road leading to plaintiff's house, and that heat was escaping from the dump. On cross-examination she was asked whether she saw a dump truck dumping broken and bitten pipe into the cave-ins, and she replied, "Yes, sir. Easily ten years before 1936." She was asked: "At that time there was no fire, or no heat of any kind?" She answered: "I never noticed it."

The court in its opinion said: "All the evidence in the case discloses beyond any question that this refuse dump had been in use for twenty-five or thirty years and, in our opinion, the testimony is very indefinite and unsatisfactory as to the firing of the outcrop of coal, or any of the coal in the mine workings at any time within the period of the statute of limitations. The only evidence is that there were hot ashes dumped there, but there is no satisfactory evidence as to the time of the origin of the fire, if the fire caused the generation of the gases."

P. F. Nairn, a former deputy secretary of mines and qualified as an expert on mines and mining, testified on plaintiff's behalf that over the sink in the kitchen of the latter's home he found carbon dioxide and a small quantity of carbon monoxide. A drain pipe extended from this sink down into the abandoned workings of a coal mine. He said that over the sink his "flame safety lamp went out," thus indicating to him that there was present "10% or more of the [gas] mixture." In the cellar there was about 7% of deadly gas "coming up through cracks and crevices." The court asked the witness: "Is this gas similar to the gas that is found in coal mines?" The witness answered: "It is the same thing." A map offered in evidence showed abandoned mine workings under plaintiff's home. After the witness had said that "gas is a part of the formation of every coal seam," the court asked: "That gas does not depend entirely upon whether the coal is on fire or not?" The answer was: "No, carbon monoxide will generate in a mine even though there isn't any fire." He also testified: "Fires

usually occur in the waste places in the mine, and they are due to the presence of iron pyrites, commonly known as sulphur." He said there was smoke coming up through the cracks to the surface, about 300 feet from the Mislevy home and that fire would increase the amount of gases "and as the pressure is increased, it would have to advance to other parts of the workings to accumulate or be forced through to the surface." He was asked: "Is it your opinion that that is what happened in this case?" He answered: "Well, I know it was coming up through the cracks in the cellar, and through the drain pipe, over the sink, and I know that the outcrop was on fire." He examined the watercourse tunnel through the Mislevy property and found "there was no gas present in the tunnel." This tunnel passed within a few feet of the Mislevy home and was open at both ends. The witness testified on cross-examination that "abandoned mines, when the circulation of air is cut off, could catch fire by spontaneous combustion." This would necessitate, he declared, "some coal, either outcrop or waste coal being there." He added: "Fires usually occur in the waste places in the mine."

J. W. Paul, a mining engineer called by plaintiff, testified that "when a coal mine is closed up . . . no circulation of air passing through—carbon dioxide forms and this uniting with nitrogen and oxygen forms black damp, a gas that won't support life." This witness testified that in his opinion the origin of the fire in the dump 600 feet away from plaintiff's home was that "it was caused by the application of either fire, or hot material, either at the outcrop, or at some of the caved holes. I do not believe the conditions are favorable for spontaneous combustion." The witness also gave it as his opinion that if there was a fire in the underground workings of this mine, gas from this fire could reach plaintiff's home "unless there was some very positive barrier constructed within the mine to prevent the spread of the gases."

A reading of the testimony in this case leaves one in complete doubt as to whether the gas in plaintiff's home was the gas that naturally accumulated in the abandoned coal mine under his home or whether it was gas generated by a coal fire caused by the defendant's dumping of hot material 600 feet from his home. Even if the gas came from a coal fire, it is uncertain whether this fire was caused by the dumping of hot material by the defendant or by spontaneous combustion in the abandoned mine. There was also some evidence that certain residents of the town burned rubbish on a dump about half way between the dump in question and plaintiff's home. Plaintiff's evidence fails to establish his claim, to wit: that the defendant caused the ignition of coal 600 feet from his home and that this ignition caused the generation of the gases. The evidence in this record is equally consistent with the theory that the deleterious gas had its origin in natural causes with which the defendant had no connection.

Those who sustain injuries and attempt to fasten upon others liability for these injuries must always bear in mind that the burden of proof rests upon them. To suspect or charge another with wrong-doing resulting in damages is one thing; proof of that charge is another. A party attempting to fix liability on another has no right to have his evidence submitted to a jury if it is so inconclusive, i. e., so lacking in persuasiveness, that it fails to establish to an ordinary, reasonable mind the truth of the charge or claim made. If the evidence is as consistent with the nonprobability of the charge made as it is with its probability, then the plaintiff has failed to establish his claim by preponderating proof.*

In *Erb v. P. R. T. Co.*, 256 Pa. 567, 570, 100 A. 966, we held that "the burden was on plaintiff to show that

---

* "There is no measure of the weight of evidence (unless the witnesses on the evidential facts are counted) other than the *feeling of probability* which it engenders": Dean William Trickett, The Forum, Dickinson School of Law, Vol. 10, p. 76.

defendant's negligent act was the sole and proximate cause" of the act complained of "to the exclusion of other causes. To show a state of facts from which it appears the injury may have been due to one or more causes is not sufficient." In *Goater v. Klotz*, 279 Pa. 392, 396, 124 A. 83, this court said: "Where the burden of proof is upon the plaintiff to establish certain facts before a recovery can be had, and his testimony, or that of his witnesses, on the question, is so contradictory as to present to the jury no basis for a finding, except a mere conjecture, a nonsuit is properly entered." See *Ely v. P. C. C. & St. L. Ry.*, 158 Pa. 233, 27 A. 970. In *Venzel v. Valley Camp Coal Co.*, 304 Pa. 583, 591, 156 A. 240, this court said: "There was no preponderating probability as to which gas caused his death. If either one of two possible causes may be responsible, it cannot be held liable." In *Natvig et ux. v. P. R. T. Co.*, 293 Pa. 355, 359, 143 A. 18, this court held: "If the evidence be so contradictory in the material parts as to which the plaintiff has the burden of proof so that any verdict given thereon would be a mere guess, the jury should not be permitted to consider it [citing cases]. The function of reconciliation of testimony by juries *(Parker v. Matheson Motor Car Co.*, 241 Pa. 461 [88 A. 653]), is not abrogated by this principle. . . . The other rule is applied only when it is clear to the trial judge the verdict would be but a guess, or where the testimony leaves the matter uncertain as to the possible cause of the injury, so that the jury might guess between a number of causes of the accident, for one or more of which the defendant may not be responsible: *Raftery v. Pgh. & West Va. Ry.*, 284 Pa. 555, 558, 131 A. 470."

The court below aptly said: "The crux of the case rests upon the fact that it is impossible to state from the evidence when the fire originated, if it originated at all, and the jury would be required to guess as to the cause of the generation of the poisonous gases in question. If the fire started prior to the period of the statute

of limitations and injury resulted to the plaintiffs from the generation of gases from that source, recovery would be barred by the statute of limitations."

The judgment is affirmed.