## Commonwealth *v.* Cavanaugh, Appellant.

114

Argued March 4, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Stanley F. Coar,* with him *James W. McNulty,* for appellant.

*Carlon M. O'Malley,* Assistant District Attorney, with him *James F. Brady,* District Attorney, for appellee.

OPINION BY HIRT, J., April 10, 1946:

Defendant, Claire Cavanaugh, was convicted of fraudulently converting $1,152.42 to her own use, then rightfully part of the estate of Sadie M. Cavanaugh, de-

ceased. In this appeal from the sentence ordering her to make restitution, it is contended that she, at least, is entitled to a new trial because of error in the admission of damaging testimony over objection. If the court was right in the rulings complained of, the record sufficiently establishes the essentials of the offense and defendant's guilt.

Sadie M. Cavanaugh, single, died intestate on February 23, 1942, at an advanced age. For twenty years she had lived with a sister, Agnes Cavanaugh in the Catholic Women's Club in Scranton where they shared the same room. Prior to her death she had a number of deposit accounts in various banks, the accumulations of her life savings from earnings as a seamstress—among them an account of $1,152.42 in her name in the Third National Bank of Scranton. On April 11, 1935, Sadie M. Cavanaugh suffered a cerebral hemorrhage. The stroke resulted in partial paralysis of her right side with some loss of speech and a gradual degeneration of the brain with progressive and permanent loss of mental function. In the opinion of her physician she, in June 1941, had the mind of a three-year-old child and was unable to transact, understandingly, even ordinary business affairs. Because of mental deterioration, in the opinion of this witness, she could easily have become the victim of designing persons. The evidence charges defendant with knowledge of a conspiracy between her husband, Harry J. Cavanaugh, (a brother of decedent) and Agnes Cavanaugh, to get control of their sister's bank accounts for their own benefit and to defeat other heirs at law or legatees of Sadie M. Cavanaugh on her death. Agnes Cavanaugh, because of a physical breakdown was unable to continue to care for her sister and when she on July 7, 1941 went to a hospital for treatment, Harry Cavanaugh moved his sister Sadie to his home where she remained for several weeks with him and the defendant. While there, Harry took Sadie M. Cavanaugh to the Third National Bank on July 23, 1941 where she, by

mark, signed a withdrawal check for $1,152.42 closing her interest account. This check was immediately deposited by Harry in an account in his name alone, in which there was then a balance of but $3.00. On August 25, 1941, this deposit, with the prior credit, was transferred to a new account in the name of Harry Cavanaugh and Claire Cavanaugh, his wife. Harry Cavanaugh died November 5, 1941. After the death of Sadie M. Cavanaugh, defendant withdrew the entire amount and used it as her own.

Of course one may not be convicted of fraudulent conversion if title and ownership of the property is in him. But the mere fact that defendant, as the survivor of nominal depositors by entireties, had the right of withdrawal which the bank recognized, did not vest title to the fund in defendant or change her status to that of debtor to the estate of Sadie M. Cavanaugh, relieving her of the charge. *Com. v. Mitchneck,* 130 Pa. Superior Ct. 433, 198 A. 463. Under the Penal Code (Act of June 24, 1939, P. L. 872, §834, 18 PS 4834) proof of receiving money or property "in any capacity or by any means or manner" will support the charge, if fraudulently withheld from the owner. But to sustain a conviction there must be proof of fraudulent intent to convert the property of another. *Com. v. Irvine,* 125 Pa. Superior Ct. 606, 190 A. 171.

There can be no doubt that defendant's husband, Harry, took advantage of the mental incapacity of his sister Sadie and her consequent ready response to suggestion, in defrauding her of her money. The trial judge however was careful to warn the jury against imputing to defendant "the sins of her husband", and specifically instructed them that the charge could be sustained only by proof of her intent to convert the money to her use with full knowledge of its source in fraud. The proofs charge defendant with more than a moral obligation to return the fund; the testimony convicts her of a conversion with fraudulent intent.

There is evidence, other than medical testimony, of the mental incapacity of Sadie M. Cavanaugh. In spite of her testimony that Sadie's mental condition in July 1941 was good, defendant must have known that she was incapable of safeguarding her interests in parting with her estate. And the jury were not obliged to accept defendant's testimony that her husband told her that Sadie had made a gift of the money to him, and that she relied upon that belief in appropriating the money to her own use. Her own testimony rebuts that inference. Her admission of knowledge of a conspiracy read into the record, is that Agnes Cavanaugh ". . . prevailed upon my husband to intercede with Sadie Cavanaugh to get this money off her, and that arrangement was that they would go fifty-fifty with whatever Sadie Cavanaugh would leave, and naturally if they went fifty-fifty on what they got, they would go fifty-fifty on the expenses". Defendant denied knowledge that her husband had taken Sadie to the Third National Bank on July 23, 1941, but in self-contradiction, testified that she knew "all about how he got the money from Sadie" and that she knew "he was going to get it". Defendant signed a signature card when the fund was transferred to a new account in her name and that of her husband, and the pass book was kept in a desk in her home. She must have known the amount of the initial deposit and her admission charges her with knowledge of its fraudulent source. She testified that in 1942, one month after Sadie's death, she told Agnes Cavanaugh that she would pay one-half of Sadie's funeral expenses. Her reason as stated by her was: "I knew when I heard him [Harry] tell her [Agnes] to keep strict account of all expenses, and I naturally wanted to live up to whatever agreement he made . . ." "I just listened to the conversation. I just wanted to follow what I thought he would do, pay half the expenses". The testimony of Agnes Cavanaugh is consistent with the existence of the agreement referred to by defendant. In July 1941 she with Sadie and Harry

went to the First National Bank and there transferred $5,202.43, a balance to Sadie's credit, to a new account in their three names upon which any one of them could draw. An offer, to prove that Harry Cavanaugh later withdrew the whole amount in cash, without an accounting, was properly refused, for it did not charge defendant with participation in the withdrawal or a subsequent conversion.

On the trial of this case defendant did not take the stand. However she had testified when called as on cross-examination in a prior equity proceeding brought by the executrix of the estate of Sadie M. Cavanaugh to compel her to account for the proceeds of this and other funds allegedly obtained from decedent by fraud. Her testimony in that case was read into the record here. This is the testimony to which we have referred, above. It is defendant's contention that since she was called as on cross-examination by plaintiff in the equity proceeding, the admission of prior testimony in this criminal case was improper, in that it was the equivalent of compelling her to give evidence against herself in violation of right. Constitution of Pennsylvania, Art. 1, §9.

With this we cannot agree. No infringement of constitutional right can be inferred from the appearance of a witness in response to subpœna or from examination under oath when called as on cross-examination. *Com. v. Bolger,* 229 Pa. 597, 79 A. 113. Defendant in the equity case was obliged to appear as a witness in response to subpœna, and, as an adverse party to the action, was subject to call by the plaintiff as on cross-examination. While bound to take the stand and to testify to the point where the interrogation put her in danger of self incrimination (*Com. v. Tracey,* 137 Pa. Superior Ct. 221, 8 A. 2d 622) the compulsion ended there, and it was for her then to have refused to testify further on claim of privilege. If in the course of an examination a witness has reasonable apprehension of imminent danger, he may not be compelled to answer; but he may refuse only

if the privilege of silence is claimed. Cf. *Com. v. Bell,* 145 Pa. 374, 22 A. 641. " 'The privilege is merely an option of refusal; not a prohibition of inquiry': Wigmore, sec. 2268. If a privilege, it may be asserted or waived at the choice of him who possesses it. If asserted, it must be when the time has arrived, when the conditions are present that make the exercise of the privilege reasonably necessary to secure the protection intended to be conferred". *Com. v. Bolger,* supra, affirming the judgment on the opinion of Judge Head in 42 Pa. Superior Ct. 115.

An admission voluntarily made by a witness in a judicial proceeding, is competent on a subsequent trial of any issue in a criminal case to which it is pertinent. *Com. v. Ensign,* 228 Pa. 400, 77 A. 657; *Com. v. Roth,* 71 Pa. Superior Ct. 71. A prior admission or declaration is evidence against one on trial in a criminal proceeding. With more reason, prior testimony, voluntarily given under oath, is admissible for the same purpose. *Com. v. Doughty,* 139 Pa. 383, 397, 21 A. 228. When this defendant waived her privilege in the equity case, the waiver became irrevocable and she was without right to assert it belatedly in this criminal proceeding as a valid objection to the admissibility of her previous incriminating testimony. *Com. v. Tracey,* supra.

Appellant assigns as error the refusal to strike out the testimony of Dr. Kiesel, the sole medical witness. His attendance of Sadie M. Cavanaugh, over a period of years, ended in June 1941. He testified, without objection, that his daughter, a doctor of medicine, attended her thereafter, from July 7 to August 13, 1941. His daughter was not available as a witness but want of direct and specific medical testimony of Sadie's mental condition on July 23, 1941, is not of serious importance. Such testimony would be cumulative merely. The jury accepted Dr. Kiesel's professional opinion and his conclusion that Sadie's mental degeneration was permanent and incurable and that all that could be done by treat-

ment was to administer to her physical needs. His testimony as to the degree of mental deterioration in June 1941 is also proof of her lack of capacity one month later. Heresay testimony was elicited from Dr. Kiesel as to the specific dates of his daughter's calls on Sadie, but this testimony was brought out by defendant in cross-examining him; defendant therefore may not complain on that score. At the close of the examination of Dr. Kiesel, defendant moved to strike out his *entire* testimony. The court's refusal was not error for his testimony certainly was not incompetent in its entirety.

We have considered the remaining questions raised by defendant's assignments of error and are unable to find merit in them.

Judgment of sentence affirmed.