## Commonwealth *v*. Bartell et al., Appellants.

530

Argued September 30, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Hugh J. McMenamin,* with him *J. Charles Hanahue, James E. O'Brien, Warren, Hill Henkelman & McMenamin* and *Kennedy, O'Brien & O'Brien,* for appellants.

*Carlon M. O'Malley,* District Attorney, with him *William J. Kearney,* First Assistant District Attorney, for appellee.

OPINION BY RHODES, P. J.:

These appeals by defendants, Joseph Bartell, Philip Brady, John Durkin, and Anthony Bonacuse are from judgments of sentence of the Court of Quarter Sessions of Lackawanna County. Defendants were indicted for conspiracy "to unlawfully, wilfully, wantonly, and maliciously damage and destroy and cause to be damaged and destroyed a certain partially built and constructed building and structure then and there situate at Number 1045 North Main Avenue, in the City of Scranton." The prosecution arose out of the dynamiting of the dwelling which was being constructed by nonunion labor.

Defendants were tried and convicted by a jury. Their motions in arrest of judgment and for a new trial were denied, whereupon sentences were imposed.

Defendants, with the exception of Durkin, were officials of building trades unions in the Scranton area. Durkin was an officer of Local No. 229 of the International Brotherhood of Teamsters, Chauffeurs and Helpers. All defendants were members of the Scranton Building Trades Council. The Scranton Building Trades Council is an affiliation of twenty-six unions including the Teamsters' Union. Defendants were also connected with other labor organizations. A previous trial resulted in a jury disagreement.

These facts were established by the jury's verdict: In January, 1954, Edward Pozusek, a building contractor from Luzerne County, contracted to erect in Scranton a dwelling for Mr. and Mrs. Andrew Ruby. Construction was started in April, 1954. On the first day, while excavating the cellar, defendant Bonacuse appeared and inquired of Pozusek whether he was conducting a union job. Pozusek replied that he was not, whereupon Bonacuse said: "I'd really advise you to get into the union or you'll have plenty of trouble around here." Before leaving Bonacuse stated that he would return. On April 28, 1954, Bonacuse, accompanied by defendants Bartell and Brady, called upon Pozusek again. The three defendants demanded to know whether Pozusek "was union." Bartell then questioned the right of Pozusek to build a home in the Scranton area and told him to go back to Wilkes-Barre where he belonged. When Pozusek refused to be intimidated, Bartell stated: "You don't know the first . . . thing about trouble, . . . Why, we'll give you so . . . much trouble over here you'll get out of Scranton with ulcers." The three defendants then conferred and departed. The next day, April 29, 1954, Bartell, Brady, and Bonacuse went to Tobyhanna, Pennsylvania, to see Paul Bradshaw who was employed in the construction of the United States Army Signal Corps Depot, and who was

also a steward in the Teamsters' Union. Before these three defendants arrived, Bradshaw had talked by telephone to the defendant Durkin who told Bradshaw that Bartell and Brady were on their way to see Bradshaw and "some of the boys." Durkin instructed Bradshaw to go along with whatever they wanted. Bartell and Brady spoke to Bradshaw and one Joseph Malloy about a "wise-guy" contractor who was building a nonunion house in Scranton, and who had to be taught a lesson. Meanwhile, Bonacuse had crossed the road to talk to a steward of his union. Bartell told Bradshaw and Malloy they wanted the foundation walls knocked out and the joists cut so that the building would collapse under weight. Brady told Bradshaw to get in touch with another teamster, Robert Hubshman, who apparently had knowledge of the proposed destruction of the Ruby house. Bradshaw and Malloy recruited another member of the Teamsters' Union, George Murphy, to help carry out the instructions. That same evening Bradshaw, Hubshman, Malloy, and Murphy met in Scranton with defendants Bartell and Brady and discussed the plan to damage the Ruby property. Bradshaw, Hubshman, Malloy, and Murphy then went to the Ruby premises. They decided that they could not do an effective job with saws and crowbars. They concluded to use dynamite. Thereupon they proceeded to Jessup, Pennsylvania, where they contacted William Munley, a member of the Teamsters' Union, and enlisted his aid as a dynamiter. The following day, April 30, 1954, Bradshaw, Hubshman, and Malloy talked with defendant Bartell about the use of dynamite; Bartell told them to use only saws to cut the joists and to knock out the foundation. Bartell furnished the saws. That night Bradshaw, Hubshman, Malloy, and Murphy went to Jessup to pick up Munley and the detonator. They all returned to Scranton and dynamited the Ruby house.

Bartell then paid them $100 which they divided; he expressed disapproval of the use of explosives but told the men to keep quiet.

Bradshaw was subsequently arrested, indicted, and convicted of feloniously dynamiting the Ruby property. The Scranton Building Trades Council provided counsel for Bradshaw. About two weeks prior to Bradshaw's trial in January, 1955, defendant Durkin visited Bradshaw at his home and told him that if he would take the "rap" and keep quiet his family would be taken care of. Durkin assured Bradshaw that his jury would be fixed. Before his trial Bartell also talked to Bradshaw and told him that he should keep quiet and that everything would be all right. On the Saturday preceding Bradshaw's trial, three of the present defendants, Bartell, Brady, and Durkin met with Bradshaw and his trial counsel and conferred about the defense; Bradshaw was given $100 to pay to one of his witnesses.

After Bradshaw had been convicted, Brady also told Bradshaw to "take the rap," and promised Bradshaw that his wife would be given $150 to $200 a week as long as he was in jail. Bradshaw became dissatisfied with the failure of the union officers to keep their promises, and, on May 31, 1955, he gave a statement to a Scranton newspaper reporter directly implicating the dynamiters, Hubshman, Malloy, and Munley. The present defendants were not mentioned in the statement. Hubshman, Malloy, Murphy, and Munley were subsequently indicted and entered pleas of guilty to the charge of feloniously using dynamite at the Ruby premises; they were sentenced to prison. On June 10, 1955, Bradshaw gave a second statement to the newspaper reporter in which the present defendants were implicated. Following a grand jury investigation they were indicted for criminal conspiracy.

Defendants question the sufficiency of the evidence to sustain their convictions. The facts as we have summarized them clearly demonstrate the role of each of the defendants in the conspiracy. All of them did not participate in every step of the plan, but each played an essential part in the series of events leading to the overt act.

Bonacuse initially, and then with Bartell and Brady, opened the matter with Pozusek; they made the threats which were subsequently consummated. Together they went to Tobyhanna to make the arrangements with Bradshaw. There Bartell and Brady solicited Bradshaw and others to do the actual damage. Durkin made the contact between the officials of the building trades unions and the members of his own Teamsters' Union who were recruited to inflict the damage; he gave approval to the unlawful job which the officials of the other unions laid out to be perpetrated by the members of his union. Moreover, the actions of Durkin with Bradshaw after the dynamiting, in an effort to prevent prosecutions, are indicative of his own participation in the original plan. It is significant that two police officials testified that Durkin told them that if he had known they were going to use dynamite the job would not have been done. Bartell and Brady are too obviously implicated by their conduct to require any further elaboration. The criminal action of the dynamiters was the product of the combined efforts of defendants.

Defendants would have us hold that the testimony of Bradshaw should be declared unreliable as a matter of law. Since it was Bradshaw's testimony which directly connected all the defendants with the conspiracy they contend that there is thus insufficient evidence to sustain the convictions. We do not agree that Bradshaw's testimony should be rejected as a matter of law.

Although Bradshaw may be under indictment for perjury he has not been convicted and sentenced. Until that time he is a competent witness. *Com. v. Billingsley,* 160 Pa. Superior Ct. 140, 146, 50 A. 2d 703. The conflicts or contradictions between the testimony of Bradshaw at this trial and his prior statements are matters which could affect his credibility and which the jury could consider in its deliberations. The jury was properly instructed that it should scrutinize Bradshaw's testimony with care, but his testimony was not of such a nature as to make it completely unworthy of belief. If a witness has made inconsistent or contradictory statements they may affect his credibility (*Com. v. Turner,* 371 Pa. 417, 430, 431, 88 A. 2d 915; *Com. v. Fields,* 171 Pa. Superior Ct. 177, 181, 90 A. 2d 391) but they do not make him an incompetent witness. In fact, even if a witness testified differently at a former trial his testimony at a subsequent trial is not to be rejected for this reason alone; such contradictory statements " 'affect his credibility, but do not authorize an instruction to the jury not to believe him.' " *Com. v. Alessio,* 313 Pa. 537, 544, 169 A. 764, 766. Where a witness is confronted by such contradiction his final statement is the one which controls. *Stewart v. Ray,* 366 Pa. 134, 143, 76 A. 2d 628. It is true, of course, that a case should not go to the jury where the party having the burden offers testimony of a witness, or of various witnesses, which is so contradictory on the essential issues that any finding by the jury would be a mere guess. See *Com. v. Rex,* 147 Pa. Superior Ct. 121, 124, 24 A. 2d 98; *Kobierowski v. Commonwealth Mutual Insurance Co.,* 175 Pa. Superior Ct. 387, 393, 105 A. 2d 179; *Mudano v. Philadelphia Rapid Transit Co.,* 289 Pa. 51, 58, 59, 137 A. 104; *Musleva v. Patton Clay Manufacturing Company,* 338 Pa. 249, 255, 12 A. 2d 554. However, the mere fact that there are some

inconsistencies is not alone sufficient to destroy the case. *Danko v. Pittsburg Railways Company,* 230 Pa. 295, 298, 79 A. 511. The function of a jury is to reconcile conflicting testimony; it is only when the testimony is so contradictory on the basic issues as to make any verdict based thereon pure conjecture that the jury should not be permitted to consider it. *Raftery v. Pittsburgh & West Virginia Ry.,* 284 Pa. 555, 558, 131 A. 470; *Musleva v. Patton Clay Manufacturing Company,* supra, 338 Pa. 249, 255, 12 A. 2d 554. As we read the testimony Bradshaw was corroborated by other witnesses in certain material respects concerning his meetings with defendants and their participation in the manner indicated. For example, although Malloy testified that Brady and Bartell had no "business dealings" with him at Tobyhanna, he did testify that Brady was present at a meeting of the dynamiters on the night of April 29, 1954. Mrs. Margaret Kollra testified that she visited defendant Durkin on July 15, 1955, and that he had an "off the record" conversation with her about the dynamiting. He told her that the four dynamiters were stupid in admitting their guilt; that the three unions were getting together a $10,000 fund for her brother, Paul Bradshaw; and that the men had been told only to saw the beams, not to use dynamite. The attorney who represented Bradshaw at his trial testified that he had been retained by the Scranton Building Trades Council to defend Bradshaw; that at Christmas time, 1954, prior to Bradshaw's trial, the defendant Bartell directed the payment of $200 to Bradshaw; that just before Bradshaw's trial $100 was provided for Bradshaw's witness; that the week prior to Bradshaw's trial the defendants Bartell, Brady, and Bonacuse were in his office. Miss Helen Canfield testified concerning the $200 payment to Bradshaw, and she also testified that she was present at a meeting be-

tween Bartell and Bradshaw a week or two after Bradshaw's arrest at which time Bartell told Bradshaw, who was nervous and upset, "Well, you know it isn't you they want, it is me. . . . You are acting like a two-year-old, you got nothing to worry about, everything will be taken care of, and if you just keep your chin up and your mouth shut everything will be all right."

Furthermore, the prior statements of Bradshaw, which are at variance with his testimony in this case in some respects, were made when defendants were attempting to keep Bradshaw from implicating the others. At first he was promised that his case was "fixed"; later, after his conviction, he was told that he would be taken care of. Defendants cannot now take advantage of the false or contradictory statements which Bradshaw may have made at their instance. Bradshaw's explanation of the prior statements was a matter for the jury's consideration. *Com. v. Alessio,* supra, 313 Pa. 537, 544, 169 A. 764.

The motions in arrest of judgment on the basis of the insufficiency of the evidence to sustain the convictions were properly refused. Act of June 15, 1951, P. L. 585, §1, 19 PS §871. The evidence presented by the Commonwealth was sufficient to sustain the charge. See *Com. v. Wright,* 383 Pa. 532, 536, 119 A. 2d 492.

Defendants, in requesting a new trial, enumerated certain alleged errors prior to trial and in the course of the trial. They also complain of the charge of the court, and contend further that "under all the circumstances all defendants were denied a fair trial."

Immediately prior to the beginning of their trial on October 15, 1956, defendants filed a petition to have the court appoint a board of psychiatrists to examine Bradshaw with respect to his competency to testify. The petition was based on the contention that Bradshaw had given contradictory stories in the past to

such an extent that there was substantial reason to conclude that he was unworthy of belief as a "pathological or psychopathic personality." In this connection it was also alleged that Bradshaw's behavior indicated that he had a personality which refused to acknowledge his own guilt, and that he rationalized his innocence by blaming his plight on other persons. The object of the allegations was to show "a complete lack of comprehension of the significance of a witness's oath." The Commonwealth filed an answer to this petition averring that Bradshaw was "truthful, logical and comprehensive" in his testimony at the prior trial and that he had been corroborated not only by other witnesses but by the defendants as well. The trial judge denied defendants' petition and the trial proceeded. The question of Bradshaw's competency was not raised when he was called to testify or during the course of his testimony. See *Com. v. Kosh,* 305 Pa. 146, 154, 157 A. 479. The competency of a witness is a matter for the trial judge to determine; his action is not reviewable on appeal in the absence of a clear error in the determination or unless there has been an abuse of discretion. *Com. v. Kosh,* supra, 305 Pa. 146, 155, 157 A. 479. Defendants base their attack upon Bradshaw's competency on an allegation that he has a "pathological or psychopathic personality." Even if true, the general rule is that a person affected with insanity is competent to testify "if he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue." *Com. v. Kosh,* supra, 305 Pa. 146, 156, 157 A. 479, 482. The burden was upon defendants to establish the incompetency of Bradshaw; this they have failed to sustain. *Com. v. Kosh,* supra, 305 Pa. 146, 155, 157 A. 479. The burden is not met merely by aver-

ring generally in a petition that the witness had given contradictory testimony in the past and that he is under indictment for perjury. Under the circumstances we find no error or abuse of discretion on the part of the trial judge in refusing the petition for a psychiatric examination.

Defendants make reference to certain alleged errors in the course of the trial. The first relates to the admission in evidence, on behalf of the Commonwealth, of a written sworn statement made by the witness Bradshaw to a newspaper reporter on June 10, 1955, which we shall refer to as the "second statement." This statement was made by Bradshaw after his own trial and before the indictment of these defendants. Ten days prior to making the second statement Bradshaw, on May 31, 1955, gave a statement to the newspaper reporter in which he described the dynamiting of the Ruby dwelling but implicated only the actual dynamiters. The present defendants were not mentioned. We shall refer to this as the "first statement." It was in the second statement that Bradshaw first implicated the present defendants and told substantially the same story that he told on the witness stand. We shall review the circumstances which led to the admission of these statements. Neither of the statements was brought out on direct examination by the Commonwealth, as it would have been improper to do so. Statements made by a witness previous to trial are ordinarily not admissible at the instance of the party calling the witness because such statements are plainly hearsay. See *Lyke v. Lehigh Valley Railroad Co.*, 236 Pa. 38, 48, 84 A. 595. The fact that these statements were made was not itself relevant to any issue concerning the guilt or innocence of the defendants. On cross-examination, however, counsel for defendants questioned Bradshaw in detail about the first statement which did not im-

plicate the defendants. The obvious purpose was to impeach his credibility on the basis of a prior inconsistent statement. The cross-examination was designed to show that Bradshaw had previously made a sworn statement placing the blame on the dynamiters alone and not on the defendants. On redirect examination the Commonwealth offered in evidence the second statement. There was an objection by defendants; it was admitted with a caution to the jury that it was not substantive evidence but was introduced merely to explain the matters brought out on cross-examination and to show that Bradshaw had, within ten days after the first statement, made a statement consonant with his testimony. Defendants contend that the admission of the second statement was reversible error. A prior statement consistent with the testimony of a witness at a trial may be introduced, in the exercise of the sound discretion of the trial judge, in order to support the credibility of a witness whose testimony has been attacked as a recent fabrication. *Craig v. Craig,* 5 Rawle 91, 97; *Lyke v. Lehigh Valley Railroad Co.,* supra, 236 Pa. 38, 48, 84 A. 595; *Com. v. Robinson,* 148 Pa. Superior Ct. 61, 69, 24 A. 2d 694; *Com. v. Goetz,* 129 Pa. Superior Ct. 22, 29, 195 A. 144. Such prior statement must be one made at a time when its ultimate effect on the question trying could not have been foreseen. *Craig v. Craig,* supra, 5 Rawle 91, 98; *Risbon v. Cottom,* 387 Pa. 155, 161, 127 A. 2d 101. This second statement was made more than a year after the crime and after Bradshaw's own trial; it was also made after the first statement in which he did not implicate the defendants. There might be merit, under normal circumstances, to the argument that the second statement does not meet the technical requirements of a prior consonant statement. Ordinarily, where a witness admits having made the prior impeaching statement, as Brad-

shaw admitted making the first statement here, a prior consonant statement is not admissible. *Com. v. White,* 340 Pa. 139, 143, 16 A. 2d 407; *Risbon v. Cottom,* supra, 387 Pa. 155, 163, 127 A. 2d 101. But while Bradshaw admitted making the impeaching statement of May 31, 1955, he offered an explanation therefor, as he was entitled to do. *Com. v. Alessio,* supra, 313 Pa. 537, 544, 169 A. 764; *Herr v. Erb,* 163 Pa. Superior Ct. 430, 435, 62 A. 2d 75. Bradshaw's explanation in this instance was to the effect that as late as May 31, 1955, when the first statement was made, he was continuing to shield the defendants; he testified he was "covering up" for them. He abandoned this protective role ten days later when he implicated the defendants and made a full disclosure in the second statement consistent with his testimony at the trial. The fact that he made the second statement consistent with his testimony at the trial corroborates his explanation and tends to rebut the inference created on cross-examination that his testimony was of recent fabrication. It is to be noted that, although the second statement was not made for more than a year after the dynamiting, it was made shortly after Bradshaw withdrew from the conspiracy of silence to which the defendants induced him to agree by their promise of procuring his acquittal and providing for his family after his conviction. ". . . to a considerable extent the admission of such testimony is a matter to be decided in each case by the trial judge in the exercise of a wise discretion and depends largely upon the character and degree of impeachment indulged in by the opposite party." *Lyke v. Lehigh Valley Railroad Co.,* supra, 236 Pa. 38, 50, 84 A. 595, 599. Under the circumstances the trial judge did not abuse his discretion in permitting this statement to be introduced for the limited purpose. See *Com. v. Del Vaccio,* 299 Pa. 547, 552, 553, 149 A. 696.

In the course of the Commonwealth case the district attorney was permitted to cross-examine the Commonwealth witnesses Hubshman and Malloy, two of the dynamiters. As the trial judge termed it, these witnesses testified "reluctantly," and our examination of their testimony likewise indicates that they were reluctant and hostile. There was no plea of surprise by the Commonwealth, but the district attorney was nevertheless permitted to cross-examine them and to refresh their recollection by use of their prior statements and prior testimony. A plea of surprise was not necessary. The fact that they were hostile and adverse witnesses was alone sufficient basis for the trial judge, in the exercise of his sound discretion, to permit the cross-examination. *Com. v. Joseph,* 182 Pa. Superior Ct. 617, 623, 624, 128 A. 2d 121; *Com. v. Bruno,* 316 Pa. 394, 403, 175 A. 518. The conflict between their testimony at this trial and their testimony in the prior proceedings was sufficient foundation for permitting cross-examination. See *Com. v. Nowalk,* 160 Pa. Superior Ct. 88, 92, 93, 50 A. 2d 115. The contention that the trial judge permitted undue latitude in the direct examination of Munley has no merit. Munley had great difficulty remembering matters to which he had previously testified.

Another alleged error concerns only the defendant Brady. Brady had previously testified at the trial of Bradshaw. In the present trial this former testimony of Brady was offered by the Commonwealth, and it was read to the jury. It is argued that this was a violation of Brady's constitutional right against self-incrimination. Article I, §9, Pennsylvania Constitution. However, the giving of testimony by Brady at the prior trial was a waiver of his privilege against self-incrimination, and such testimony was admissible at this trial. *Com. v. Cavanaugh,* 159 Pa. Superior Ct. 113, 118, 46

A. 2d 579. The testimony of Brady at the former trial was voluntarily given. He was subpoenaed by the Commonwealth, but he was not called by the Commonwealth; he took the stand on behalf of Bradshaw. Although subpoenaed in the prior trial Brady nevertheless could have asserted the privilege if he felt that he was in danger of incriminating himself; not having done so he cannot now assert the privilege. *Com. v. Cavanaugh,* supra, 159 Pa. Superior Ct. 113, 118, 119, 46 A. 2d 579.

Defendants complain of the charge of the court in two respects. In the course of the charge the trial judge said: "Further, the defendants say to you that you should not believe a word that Bradshaw, Hubshman, Munley, Malloy and Murphy said, . . ." This was in accordance with a general point for charge submitted by defendants to the effect that the testimony of one who participated in the crime is considered evidence from a corrupt source, and that it should be closely scrutinized by the jury. Defendants now argue that they intended the submitted point to apply only to Bradshaw, since the testimony of the other dynamiters was favorable to them. There is no valid distinction. Despite the fact that the other dynamiters testified somewhat differently than Bradshaw, they were in the same class as witnesses in the eyes of the law. They all participated in the same crime and the testimony of all of them must be considered as coming from a corrupt source. Any implication that the defendants were the only ones to place all these witnesses in the same category was dispelled by the fact that, when the trial judge was discussing the testimony of these witnesses offered by the Commonwealth, he fully explained the accomplice rule as it applied to the Commonwealth's case. Moreover, the trial judge also charged the jury

that Bradshaw was not corroborated by the other dynamiters.[1]

Secondly, defendants assert that the charge was prejudicial as to them because it contained inflammatory remarks, that it overemphasized the Commonwealth's evidence, and that it was so phrased as to amount to an argument in favor of the Commonwealth. Of course, if the charge was of this nature it would be highly prejudicial. *Com. v. Stoltz,* 147 Pa. Superior Ct. 117, 120, 24 A. 2d 57; *Com. v. Durlin,* 75 Pa. Superior Ct. 260, 263; *Com. v. Garvey,* 65 Pa. Superior Ct. 56, 61, 62; *Com. v. Meads,* 29 Pa. Superior Ct. 321, 329; *Com. v. Silcox,* 161 Pa. 484, 498, 499, 29 A. 105. It is essential that the trial judge maintain his impartiality. See *Com. v. Phillips,* 183 Pa. Superior Ct. 377, 381, 132 A. 2d 733. We have thoroughly examined the charge and find no such prejudicial or inflammatory remarks; there was no overemphasis of the Commonwealth's case. The evidence and the arguments of both sides were fairly and impartially covered by the charge of the court. Defendants now say that the use by the trial judge of such language as "The Commonwealth says to you," when speaking of the Commonwealth side, as compared with language such as "Bartell asks you to believe" on the side of the defendants, indicates undue emphasis of the Commonwealth's case and amounts to argument in favor of the Commonwealth. The contention is obviously without merit. See *Com. v. Prescott,* 284 Pa. 255, 258, 131 A. 184. At another point in the charge the trial judge stated: "The Commonwealth argues to you that there is no room for two systems of law in our community, one a system of law

---

[1] This was more favorable to defendants than the record warranted, as Bradshaw was corroborated by the other dynamiters in several respects.

and justice administered by and through the consent of the people that we all live under, and the other a private system of force and violence administered by hoodlums to enforce the will of lawless persons. The Commonwealth says that it has proven beyond a reasonable doubt that these defendants combined and conspired to do just that by procuring Bradshaw, Hubshman, Malloy, Murphy and Munley to cause damage and destruction to the Ruby property." Defendants complain that this portion of the charge is inflammatory and tended to create passion and prejudice against the defendants. However, the language clearly indicated that this in essence was the contention of the Commonwealth, and that it was not the pronouncement of the trial judge himself. *Com. v. Prescott,* supra, 284 Pa. 255, 258, 131 A. 184. We cannot say that the statement itself was inflammatory or prejudicial, that is, of such a nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendants of a fair and impartial trial. *Com. v. Phillips,* supra, 183 Pa. Superior Ct. 377, 382, 132 A. 2d 733.

Defendants conclude their argument with the comprehensive assertion that the over-all conduct of the trial resulted in a denial of a fair trial to each of them. In this respect they point to miscellaneous happenings which they contend, when considered together, deprived them of a fair trial. They reiterate several of the alleged trial errors which we have fully discussed. To these they add several other incidents. They complain that the trial judge permitted the assistant district attorney to read Brady's prior testimony to the jury from the witness chair. As we have indicated, the prior testimony was admissible against Brady, and the fact that it was read from the witness chair was not prejudicial. The transcript of the prior testimony of Brady was

bulky, and it was difficult for the assistant district attorney to hold and read it while standing. The trial judge cautioned the jury that it was admitted only against the defendant Brady and not against the other defendants. Neither the admission of this prior testimony nor the manner of its presentation was error. Defendants allege prejudice in the fact that the trial judge permitted two state police officers in uniform to be in the corridor outside the court room to keep order and to clear the way when the jury left each day to return to its hotel. The trial judge had good reason to believe that attempts might be made to influence the jury, and it was his duty to take reasonable steps to insure that they would not be exposed to any such influence. See *Com. v. Fisher,* 226 Pa. 189, 191, 75 A. 204; *Welshire v. Bruaw,* 331 Pa. 392, 398, 200 A. 67. Defendants have not shown to us that this action was unreasonable or prejudicial, or that it was an abuse of discretion under the circumstances. The uniformed police officers were not in the court room.

The Commonwealth introduced in evidence the detonator and wires used in the dynamiting. Defendants believe it was prejudicial error to introduce these objects in evidence and to permit them to be kept in the court room for several days. The detonator and wires were properly admitted in evidence to show the means used to accomplish the object of the conspiracy. For this purpose they were relevant. Although the offense of criminal conspiracy is complete the moment the agreement is made whether acts be done in pursuance of it or not, it is still proper for the Commonwealth to show the subsequent acts and circumstances in fulfillment of the conspiracy. *Com. v. Kelson,* 134 Pa. Superior Ct. 132, 135, 3 A. 2d 933. The fact that defendants may not have sanctioned originally the use of dynamite is not controlling. Where the object of the con-

spiracy is unlawful the fact that means other than those originally proposed were used for its accomplishment is immaterial. See *Com. v. Haun,* 27 Pa. Superior Ct. 33, 36. Being admissible, the detonator and wires were properly shown to the jury. Moreover, there is nothing inherently prejudicial or inflammatory about a detonator and wires. If so they might properly have been excluded from the evidence altogether.

Under this last phase of the argument defendants complain that the trial judge permitted undue latitude in the cross-examination of defendants. "The scope of cross-examination is largely within the sound discretion of the trial judge, and even if a ruling is erroneous the error is not ground for reversal unless it results in an apparent injury." *Com. v. Cano,* 182 Pa. Superior Ct. 524, 549, 128 A. 2d 358, 370. There is no injury apparent here. It was not prejudicial to ask defendant Bonacuse—who made the threats to Pozusek, who went along to Tobyhanna when Bradshaw and others were enlisted by Brady and Bartell to damage the Ruby home, who was a trustee of the Scranton Building Trades Council which supplied counsel for Bradshaw—whether or not he ever inquired of Bradshaw the reason for the dynamiting. Obviously this was to attack his credibility with respect to his denial of implication in the conspiracy. It was also proper to cross-examine defendant Bartell as to the date the Scranton Building Trades Council made its first payment to the attorney who represented Bradshaw at his trial. This was to attack his credibility as on direct examination he testified that the attorney was hired as counsel for the Scranton Building Trades Council in its regular course of business prior to and not after the dynamiting. Likewise the cross-examination of defendant Durkin, secretary-treasurer of the Teamsters' Union, as to what action was taken to expel the con-

victed dynamiters from the union was not highly prejudicial as the defendants now contend. This cross-examination was to attack his credibility as he had testified that the union did not "condone any violence of any kind." Moreover, Durkin answered this cross-examination by explaining that it was not his responsibility to see that the dynamiters were stricken from the rolls of the union.

This was a lengthy trial; the testimony and the charge of the court cover 885 printed pages. We have reviewed in detail all the matters raised by defendants, and we find no reversible error as to any defendant. The case was carefully and capably tried. The evidence presented by the Commonwealth clearly sustains the verdict of the jury. Defendants received the fair and impartial trial to which all accused persons are entitled.

The judgments of sentence are affirmed, and the record is remitted to the court below, and it is ordered that defendants appear in the court below at such time as they may there be called, and that they be by that court committed until they have complied with the sentences, or any parts thereof which have not been performed at the time each appeal was made a supersedeas.