Commonwealth *v.* Bovaird, Appellant.

48

Argued March 24, 1952; reargued November 24, 1952. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

reargument refused March 24, 1953.

Same case in Superior Court: 169 Pa. Super. Ct. 596.

*Charles J. Margiotti,* with him *Vincent M. Casey, Margiotti & Casey, J. J. McDowell,* and *McDowell & McDowell,* for appellant.

*William P. McVay,* Deputy District Attorney, for appellee.

50

OPINION BY MR. JUSTICE CHIDSEY, February 13, 1953:

Defendant was convicted and sentenced on four indictments charging fraudulent conversion under §834 of The Penal Code of 1939, 18 PS §4834, and on two indictments charging embezzlement under §824 of the Code, 18 PS §4824. This appeal is from the judgment of the Superior Court which sustained the convictions.

At the trial of the case, upon the conclusion of the taking of testimony, defendant moved for a directed verdict for the reason that the Commonwealth had not made out a *prima facie* case; that the indictments for fraudulent conversion were "repugnant" to those for embezzlement; that it was legally impossible for the offense under the proof to be both the crimes charged; and that the Commonwealth had not charged or proved a crime as set forth in the sections of the Penal Code under which the indictments were drawn. The motion was overruled, and after the jury had found the defendant guilty on all of the indictments, the same contentions were raised in motions in arrest of judgment and for a new trial, the latter raising an additional question here pressed and hereinafter separately considered.

The Commonwealth adduced evidence that on July 27, 1934, a written agreement headed with the notation "Cotenancy Agreement" was entered into by defendant and his then wife, Margaret C. Bovaird, and John J. Carter and his wife, Beth M. Carter (now Beth M. Putnam, the prosecutrix). The agreement was drawn up by John J. Bovaird, an attorney and brother of defendant. It recited in part that the parties were to be associated together as tenants in common, said cotenancy to be known as Carter & Company, for the purpose of acquiring and operating for petroleum and natural gas, certain properties or tracts of land in Mc-

Kean County, Pennsylvania; that the proportionate share of each of said "cotenants" was a one-fourth interest.

The agreement provided further that the defendant, Bovaird, would ". . . in all respects . . . manage, control and operate said property with as full and ample authority and unrestricted power as if he were the sole owner thereof . . . and for this service" he was to "be paid the sum of two hundred dollars monthly." [later increased to $250]. Carter was ". . . entitled, at any time he . . . [might] so desire, to work for Carter & Company" and he did so work later on "at the stipulated sum of two hundred dollars per month [likewise increased to $250], under the direction of the Agent, the aforementioned George Bovaird, Jr., . . .". The agreement also provided: "Paragraph 4. All oil produced . . . shall be run and credited in pipe line to the said George Bovaird, Jr., *as Agent,* and at his discretion, from time to time, sold, and the money so realized paid out by him to take up obligations, company notes and current expenses of said operations. The said George Bovaird, Jr., is accordingly authorized to deposit in the bank to a special company account, all moneys so realized from oil sales as aforesaid, and to issue checks thereon. Paragraph 5. *Upon complete payment of notes and interest, major expenditures, contracts and other obligations, if any, incurred in the course of operating said properties and reimbursement of initial installment and other advances by the aforesaid cotenants,* the said George Bovaird, Jr., shall thereafter remit to the several cotenants, their proportionate shares of the net profits of said business and at any and all times shall exhibit to the several cotenants his books of account in which his receipts and disbursements shall be regularly entered." (Emphasis supplied).

The only contributions in money to the enterprise were made by Beth M. Putnam (formerly Mrs. Carter) who furnished an initial instalment of $30,000 which was used as down money for the acquisition of the properties and two subsequent instalments, one of $27,-500 in 1940, used on account of acquisition of an additional property, and another of $10,000 later supplied by her at a time when the company could not pay a very pressing obligation. Thus Mrs. Putnam's advances totalled $67,500.

Margaret C. Bovaird died in the fall of 1934 and upon her death her interest in the cotenancy vested in her son, George Christie Bovaird, with his father as trustee. Marital differences having arisen between the Carters, in 1943 Mrs. Carter obtained a divorce and took from her husband an assignment of his one-fourth interest in the enterprise.

Of the monies so advanced by Mrs. Putnam she received back by several payments a total of $9,500. While obligations of the company remained unpaid (at the time of the trial they amounted to $300,000) and reimbursement of Mrs. Putnam's "initial installment and other advances" had not been made, the defendant, George Bovaird, Jr., nevertheless made withdrawals out of operating profits in the amount of $235,000. In the company's books the capital account of the defendant for the period of the cotenancy ended December 31, 1949 showed an overdraft of $196,704.28. The account of George Bovaird, Jr., trustee, showed a credit balance of $46,345.32; and the account of Beth M. Putnam showed a balance of $127,690.67 in her favor which represented her share of operating profits and the balance of advances due her. The defendant actually drew $235,000 in cash over and above his salary which he placed in his personal bank account for his own use.

The overdraft of $196,704.28 reflects credit for a one-quarter share of the profits.

Mrs. Putnam who took no part in the management of the enterprise and who after her first marriage in the fall of 1934 did not live at Bradford where the business was carried on, testified that from time to time she made requests of the defendant for distribution of funds but other than the $9,500 above mentioned, she received nothing. On several occasions defendant told her "Everything is going fine, we are making lots of money.", ". . . but there is no money for distribution.".

The defendant testified that withdrawals by him were authorized by Mrs. Putnam. His son, George Christie Bovaird, testified on his father's behalf that he knew of his father's withdrawals and acquiesced in them. Carter, Mrs. Putnam's divorced husband, also testifying on defendant's behalf, said it was the understanding that withdrawals were to be made by those who asked for them. Mrs. Putnam testified that she did not know that defendant was making the withdrawals in question and had not authorized them. The jury apparently believed Mrs. Putnam, and a reading of the entire record persuades us they were justified in so doing and in finding that defendant was not authorized to make the withdrawals.

The indictments were founded on specific withdrawals made within the statutory period for prosecution. Each of the four indictments for fraudulent conversion related to a separate transaction and covered a different date and amount, but all of them in substance are the same and charge that defendant being ". . . an agent of Carter and Company and as such agent being entrusted for the safe custody of the monies, accounts and properties of said Carter and Company, did . . . fraudulently, unlawfully and feloniously withhold, convert and appropriate to his own use," a cer-

tain sum of money ". . . being the funds of Carter and Company, by drawing a check of Carter and Company . . . on the account of said company in the Citizens National Bank of Bradford payable to [himself], and thereafter . . . using the proceeds of said check for his own use and benefit, . . .".

Section 834 of the Code, 18 PS §4834, provides in part that: "Whoever, having received or having possession, *in any capacity or by any means or manner,* of any money or property, of any kind whatsoever, of or belonging to any other person, or which any other person is entitled to receive and have, fraudulently withholds, converts, or applies the same, or any part thereof, or the proceeds or any part of the proceeds, derived from the sale or other disposition thereof, to and for his own use and benefit, or to and for the use and benefit of any other person, is guilty of a felony, . . ." (Emphasis supplied). The section is a re-enactment of the Act of May 18, 1917, P. L. 241.

The two indictments charging embezzlement also relate respectively to separate transactions occurring on different dates and involving different amounts but in substance are the same and charge that defendant ". . . being . . . an agent of Carter and Company and as such agent being entrusted for safe custody of the money, accounts and properties belonging to Carter and Company, of which Beth M. Putnam was entitled to have a one-half share of interest . . .", did unlawfully, *fraudulently* and feloniously take, convert and apply to his own use" a certain sum of money, ". . . said money being the property of Carter and Company." (Emphasis supplied).

Section 824 of the Code, 18 PS §4824, provides in part that: "Whoever, being a banker, broker, attorney, merchant or agent, and being intrusted, for safe custody, with the property of any other person, and, with

intent to defraud, sells, negotiates, transfers, pledges, or in any manner converts or appropriates to or for his own use or the use of any other person, such property, or any part thereof, is guilty of embezzlement, a felony . . .". The section is a substantial reenactment of §114 of the Act of March 31, 1860, P. L. 382, 18 PS §2481.

It is argued by the appellant that as a cotenant of Carter & Company he could not fraudulently convert or embezzle property of the cotenancy in all of which he had an undivided part ownership. Much of the argument in this connection relies on the theory of the law of cotenancy as applied to real property in the civil law. The criminal law is not controlled by the civil law and, while arguments and analogies from the civil law may be of value in determining the relationship of the parties as between themselves and with respect to the property in question, the final determination of this case must lie in the precepts of the criminal law, in the enforcement of which the Commonwealth is an interested party. A private wrong when made a criminal offense becomes a public wrong. Moreover, while textbooks and other authorities relied on by the defendant state generally that a cotenant who takes possession of the common property can be subjected only to an action for accounting, a distinction is made where the property is divisible in character. Thus in 14 Am. Jur., Cotenancy, §71, it is stated: "It is a general rule that trover will not lie in favor of one cotenant against another who has taken possession of the common property, unless it can be shown that the latter did so with an intent to appropriate it to himself or otherwise to deprive the plaintiff of its use or value. This doctrine is based on the theory that the foundation of the action is the right of possession and that where two or more persons are equally entitled

to possession, the one who has it cannot be guilty of a conversion by retaining it. But the rule can have no reasonable application in respect of things that are readily divisible into portions absolutely alike in quality, such as grain, money, etc. As to such things, the general view is that an action will lie whenever a cotenant in possession uses more than his share or refuses to permit his cotenant to take his proper moiety. . . .". In *Stitt v. Felton,* 136 Pa. Superior Ct. 338, 7 A. 2d 371, the Superior Court adopted the following language of this Court in *Agnew v. Johnson,* 17 Pa. 373, 378: ". . . 'The reason why one joint tenant or tenant in common cannot maintain trover against his companion, is, that both are equally entitled to possession, and the possession of one is the possession of both, and is in accordance with the right of both. *But where one misuses the joint property by appropriating it to uses for which it was not designed, and refuses to apply it to the purposes for which it was held by both,* or if one delivers the property wrongfully to a stranger, for purposes inconsistent with the uses for which it was designed, and such stranger denies title of the other, and claims the exclusive possession and ownership, the reason of the rule ceases, and trover may be maintained.' ". (Emphasis supplied).

Furthermore, we are not dealing here with a simple or pure cotenancy to which most of the authorities cited by defendant are applicable. Unlike the partnership relation where each partner automatically becomes the agent of the other partner, an agreement is required for one cotenant to become an agent for the others, and such an agreement creates an additional relationship different and apart from the relationship as owners in common. A reading of the agreement involved clearly shows that "operating for petroleum and natural gas" was the principal purpose of the associa-

tion of the parties, and the "acquiring" of real estate but a necessary prerequisite. In this connection it may be noted that title to some of the properties later acquired was improperly taken by defendant in his own name. The agreement predominantly created an agency relationship under which the defendant Bovaird was to manage and operate the enterprise for all of the parties thereto. The label "Cotenancy Agreement" could not change the actual relationship disclosed by the terms of the agreement. The defendant's status, therefore, was not merely that of a tenant in common as the relationship ordinarily arises by operation of law as, for example, in the case of acquisition of real estate by several grantees. His status was specially fixed by agreement between the parties. Under it he became a co-owner but he primarily became the agent for the other co-owners. In consideration of the salary paid for his services he undertook the management of the enterprise under the terms prescribed in the agreement, by all of which he was bound. One of these terms was that none of the gross income of Carter & Company should be distributed to any of the associates until after the payment of company obligations and expenses, and the repayment of advances made by the cotenants. This provision he grossly violated by appropriating $235,000 to his own use. It was by virtue solely of his employment as agent and not by reason of his right as a cotenant that he came into possession of the monies which he was charged with converting or embezzling. He had no immediate right of possession as cotenant to these monies received *qua* agent.[1]

---

[1] The defendant had an *interest* only in the sum of $235,000 received and appropriated by him, such interest being his share of profits upon an accounting by him as agent. Much the larger part of the sum so appropriated represented the *interests* of the other cotenants.

The defendant relied as an element of his defense upon the powers granted him as agent under the terms of the agreement. But he would disregard the restrictions, duties and trust imposed upon him as such agent. He cannot escape criminal liability by doffing the wrap of agency, a garment of his own making, and donning the cloak of cotenancy with its fictional legal attribute.

Much reliance is placed by appellant on the case of *Commonwealth v. Mitchneck*, 130 Pa. Superior Ct. 433, 198 A. 463. There the defendant Mitchneck who owned a coal mine, deducted from the wages of his employes certain sums which he was to pay to the grocer with whom the employes dealt. Mitchneck failed to pay the grocer and he was tried for and convicted of fraudulent conversion. The Superior Court reversed the conviction. Careful reading of the case reveals that the decision was based on the fact that a debtor-creditor relationship existed. In its opinion the Superior Court said: "The defendant in the present case had not received, nor did he have in his possession, any money *belonging* to his employees. True he owed them money, but that did not transfer to them the title to and ownership of the money. His deduction from their wages of the amounts of the store bills which they had assigned to Vagnoni, did not change the title and ownership of the money thus withheld, nor did his agreement to pay to Vagnoni the amounts thus deducted constitute the latter the owner of the money. It effected only a change of creditors. . . .". In the present case there was no debtor-creditor relationship, but an agency. The money received by the defendant Bovaird did not belong to him as it did to the defendant in the *Mitchneck* case, but belonged to all of the parties to the agreement, and the major portion of the monies appropriated represented the interest therein of his associates for whom he was acting as agent.

In claiming that a new trial should be granted, defendant contends that the court below erred in rejecting testimony offered by the defendant to prove the market value of the cotenancy. Appellant argues that he should have been permitted to present the value of the properties of Carter & Company at the time of trial in order to show the relationship between such value and the amount of withdrawals made by him. Upon his direct examination his counsel asked, "What would those properties bring now?", and he answered, "Well, we could sell out our holdings, I feel sure we could sell out our holdings for $1,300,000.". The court ruled that ". . . the jury should disregard the testimony of the witness as to the value of the property at this time.". Passing the question whether such testimony properly established market value, and also the question whether the value of the properties to be relevant should not have been related to the time of the misappropriations,[2] it is apparent that the purpose of the proffered testimony was to establish the defendant's ability to repay the monies he withdrew, that is, in equalizing distribution upon liquidation of Carter & Company, the amount of defendant's overdraft of $196,-704.28 could be charged against his share. The testimony was clearly inadmissible. The monies which he misappropriated were monies received by him as agent and not taken in an attempt to accomplish a withdrawal of his interest in the whole, and his contention reduces itself to the ability to "make good". It is fundamental that neither ability nor intention to repay is a defense against fraudulent conversion or embezzlement. See *Commonwealth v. Drum*, 42 Pa. Su-

---

[2] The defendant testified the value of the properties fluctuated greatly from time to time and that, at the insistence of a major creditor, a receivership was decided upon in the spring of 1950. The trial occurred in December of that year.

perior Ct. 156; *Commonwealth v. King,* 35 Pa. Superior Ct. 454. "It is well established that when one wrongfully and intentionally misappropriates the property of another lawfully in his possession to his own use, the offense of embezzlement is complete, so that the fact that he at the same time intends subsequently to return the property or to make restitution to its rightful owner does not relieve his wrongful act of its criminal nature, excuse him, or make his offense any the less embezzlement.": 18 Am. Jur., §26, p. 585. There can be no distinction between embezzlement and fraudulent conversion in this respect.

The defendant did not deny that he took and appropriated the monies for his own use. He claimed that he was orally authorized by his associates to take them. The court charged the jury that if they found the defendant had the right to take the monies, or believed he had such right, they should acquit. The jury found otherwise. He therefore wilfully and wrongfully converted and embezzled the monies as charged in the indictments. The fraud and the crime inhere in the act and cannot be excused or justified by ability or intention to make restitution at some future or indefinite period. Where one is charged with embezzlement or fraudulent conversion, the intention to abstract the money and appropriate it to his own use has been fully executed upon its wrongful taking; the ability and intention to indemnify the party from whom it has been withdrawn remains unexecuted, and such intention, even if conscientiously entertained, may become impossible of fulfillment. The crime is consummated when the money is intentionally and wrongfully converted, temporarily or permanently, to the defendant's own use.

The case of *Commonwealth v. Hazlett,* 14 Pa. Superior Ct. 352, cited by appellant, instead of support-

ing him, is in accord with the views above expressed. There the defendant, a private banker, was indicted under the Act of May 9, 1889, P. L. 145, for receiving money from a depositor with knowledge that his bank was insolvent. In reversing the lower court, the Superior Court held that the defendant banker could in defense not only show that he was solvent at the time he received the deposit, but, to rebut criminal intent, could show that he believed he was solvent. This is in essence exactly what the court charged in the present case, i.e., that the defendant Bovaird was entitled to acquittal if he had the right to make the withdrawals or if he believed he had such right. Neither in the conclusion reached by the Superior Court in the *Hazlett* case nor in any of the language used in the opinion was it declared that a defendant's ability or intention to repay constitutes a defense.

The Superior Court in its opinion in the present case properly disposed of appellant's contention that the indictments for fraudulent conversion were repugnant to those for embezzlement when it said: ". . . it is sufficient to point out that each indictment relates to a separate and distinct transaction and, furthermore, that §834 specifically provides that 'The offense specified in this section may be joined in the same bill of indictment with any other felony or misdemeanor arising out of the same transaction, and there may be included in the same indictment as many counts as there are separate and distinct misdemeanors hereunder committed against the same person.' Since each of the offenses could have been covered in a single indictment containing two counts, one charging a violation of §824 and the other a violation of §834, the indictments were not 'repugnant' nor was defendant prejudiced in any way by having the charges laid in separate indictments.". It follows that the Commonwealth was not

required to elect as between prosecution for embezzlement and fraudulent conversion as claimed by the defendant. A prosecution for fraudulent conversion ". . . is properly brought against one who has received property in any capacity and afterwards fraudulently misapplies it, even though an indictment for a different statutory offense would have been proper under the circumstances.": *Commonwealth v. Schuster*, 158 Pa. Superior Ct. 164, 167, 44 A. 2d 303. The fact that §834 (fraudulent conversion) may have been drafted for the purposes of embracing situations not falling within the provision of §824 (embezzlement) does not preclude an indictment on a specific set of facts under either of these sections. Nor is there merit in the contention that the indictments were not sufficiently specific. Section 11 of the Act of March 31, 1860, P. L. 427, 19 PS §261 provides: "Every indictment shall be deemed and adjudged sufficient and good in law which charges the crime substantially in the language of the act of the assembly prohibiting the crime, . . .". The indictments here unquestionably charged the crimes substantially in the language of the Act of Assembly and it cannot be said that defendant was not apprised of the charges he had to meet. It was not required that facts be set forth therein which were matter of proof at the trial. As said in *Commonwealth v. Wooden*, 94 Pa. Superior Ct. 452 at p. 455: "The Criminal Procedure Act of March 31, 1860, P. L. 427, provides that every indictment shall be deemed and adjudged sufficient and good in law which charges the crime substantially in the language of the act of assembly prohibiting it. Since that day the trend of the decisions of our Supreme Court has been toward sustaining an indictment as good in substance, if the charge be stated with such certainty that the defendant may know what he is called upon to answer, and the court may know

how to render the proper judgment thereon. Criminal pleading is no longer the technical thing it once was and courts look more to substantial justice than to artificial nicety: Com. v. Romesburg, 91 Pa. Superior Ct. 559; Com. v. Norris, 87 Pa. Superior Ct. 61; Com. v. Keenan and Clark, 67 Pa. 203.".

On petition of the district attorney stating that as the result of a serious illness he was unable to discharge the duties of his office, the court appointed Robert B. Apple, a member of the Bar of McKean County, ". . . to represent the Commonwealth before the grand and petit juries, during the October Sessions, 1950, . . . said appointment to expire with October term of Court.". The appointment was made in accordance with the provision of Article III, §260 of the Act of May 2, 1929, P. L. 1278, 16 PS §260, which provides: "In any case where there is no regularly appointed assistant district attorney, if in case of sickness or from any other cause the district attorney shall be unable to attend to the duties and business of the term of a court, he may appoint some competent attorney of the county, with the approbation of the court, to act as his deputy for one term, but for no longer period.". Apple as attorney of record for Beth M. Putnam, the prosecutrix in the present case, had entered a confession of judgment in favor of Mrs. Putnam and against the defendant at No. 214 October Term, 1946, in the Common Pleas of McKean County. Before the trial commenced defendant in a motion to quash the indictments, alleged that they were void because Apple was disqualified from presenting the indictments to the grand jury.[3] It is extremely doubtful whether defend-

---

[3] The indictments were returned on October 4, 1950. Apple did not represent the Commonwealth at the trial of the case which occurred in December, 1950.

ant's motion in arrest of judgment may be construed to include as a reason therefor the refusal of the court below to grant the motion to quash. However, we find no merit in the contention that the indictments were void for the reason asserted. In its opinion the Superior Court pointed out that the attorney's commission of $1,500 included in the judgment confessed did not belong to the attorney but to his client, citing *Commonwealth v. Pennsylvania Loan Corporation*, 127 Pa. Superior Ct. 253, 256, 193 A. 141. However, whether or not Apple received this commission or other fee from Mrs. Putnam for services in that transaction, there was no evidence that he represented her at the time he acted as deputy district attorney in the October 1950 Session of the court when the indictments in this case were found. Apple was an officer of the court as a member of the bar and was acting officially and specially for the court. Defendant did not claim that Apple exercised improper influence upon the grand jury or in any way deviated from the proper performance of his duties in this regard. The defendant would have misconduct inferred or presumed because of his representation of the prosecutrix on a previous occasion. To subscribe to such contention would mean that no district attorney could act as such in a case where he had sometime in the past represented the prosecutor in private litigation. Such *ipso facto* disqualification is not justified.

After carefully reviewing the record in this case and considering all of the contentions advanced by defendant, we find no reason to disturb the outcome. The defendant was represented throughout by able counsel. The charge of the trial judge was eminently fair and impartial.

The judgment of the Superior Court is affirmed.

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

The majority opinion, like those of the Superior Court and trial court, avoids the question which is the keystone of the defense, viz.: who was the "other person" from whom defendant took property?

Defendant was convicted on four indictments charging fraudulent conversion and two indictments charging embezzlement. The plain language of the appropriate sections of the penal code, which are quoted verbatim in the majority opinion, so clearly require the taking of *another's* property as an element of each crime that it is almost superfluous to cite authority. President Judge KELLER said for a unanimous court in *Commonwealth v. Mitchneck*, 130 Pa. Superior Ct. 433, 435, 198 A. 463: "The gist of the offense of fraudulent conversion is that the defendant has received into his possession the money or property of another person, firm or corporation, and fraudulently withholds, converts or applies the same to or for his own use and benefit, or to the use and benefit of any person other than the one to whom the money or property belonged. If the property so withheld or applied to the defendant's use and benefit, etc., did not belong to some other person, etc., but was the defendant's own money or property, even though obtained by borrowing the money (Com. v. Bixler, 79 Pa. Superior Ct. 295), or by a purchase on credit of the property (Com. v. Hillpot, 84 Pa. Superior Ct. 454; Com. v. Overheim, 106 Pa. Superior Ct. 424, 162 A. 475), the offense has not been committed. 'Whatever may have been the intention of the legislature in the enactment of the statute under which the indictment in this case was drawn, it was clearly not intended to make criminal the act of one who sells his own property, and it is not to be so applied as to make it an effective substitute for an action

at law in the collection of a debt': Com. v. Hillpot, supra, p. 458."

The status or capacity in which defendant *received* the money which he is charged with misappropriating is totally irrelevant to the question of who *owned* such money. The majority assert that "He [defendant] had no immediate right of ownership as cotenant to these monies received *qua* agent", but they make no effort to decide who did have its *ownership*. If anyone other than the cotenants owned the money, then the indictments are fatally defective because they charge defendant with taking "funds of Carter and Company." Under such indictments, defendant cannot be convicted for taking funds which did not belong to Carter and Company.

On the other hand, if the funds did belong to Carter and Company, then we are squarely faced with the question whether a man who misappropriates money, in all of which he has an undivided one-fourth interest, is taking the property of another person. All authority answers with an unqualified negative. 29 C. J. S., Embezzlement, sec. 8: "A fundamental principle of the common law is that *one cannot steal his own property,* and the general rule, therefore, is that the ownership of the property alleged to have been embezzled must not be in accused, *either in whole or in part. . . .*" (emphasis supplied) Practically the same words appear at 2 Wharton's Criminal Law (12th ed.) p. 1597.

In *In re Lon Sanders,* 23 Ariz. 20, 201 Pac. 93, the following statement from the case of *State v. Reddick,* 2 S. D. 124, 48 N. W. 846, 8 Am. Crim. Rep. 204, is quoted with approval: " 'It need hardly be stated that under the general statute defining embezzlement as a criminal offense the rule is that the fraudulent misappropriation of partnership funds by one of the part-

ners does not constitute embezzlement, for each partner is the ultimate owner of an undivided interest in all the partnership property, and none of such property can be said, with reference to either partner, to be the property of another, . . .' "

The annotation to this case at 17 A. L. R. 982 includes the following quotations: " 'It is well settled that a partner cannot commit a crime by any acts relating to the possession of the partnership property, such as embezzlement, larceny, or burglary, for he is both principal and agent.' " *State v. Matthews,* [129 Ind. 281, 28 N. E. 703].

" 'A partner cannot be guilty of embezzlement of partnership funds, because such partner combines in himself at once the character of principal and agent. The partners have a community of property and interest in the partnership effects. In law they are treated in a qualified sense, as joint tenants of the partnership property, having an interest therein "per my et per tout." ' " *Napoleon v. State,* [3 Tex. App. 522].

" 'The statutes of nearly all the states which undertake to define embezzlement require that the subject of the offense shall be shown to be 'the property of another,' and this has almost universally been construed to mean that it must be wholly the property of another. It has resulted that, as a rule, a member of an ordinary partnership could not be convicted of embezzlement of partnership property.' *State v. Kusnick,* . . . 45 Ohio St. 535, 4 Am. St. Rep. 564, 15 N. E. 481."

While we have no direct authority for this rule in Pennsylvania, the very fact that the Legislature thought it necessary to make fraudulent conversion of *partnership property* a separate crime (Act of June 24, 1939, P. L. 872, sec. 835, 18 PS 4835) indicates the feeling that a partner in the absence of such a statute could

*not* be found guilty under the general fraudulent conversion statute. (The original indictments under the above partnership statute were withdrawn because the district attorney concluded that this business relationship was not a partnership but a cotenancy). The only possible reason for requiring a separate statute for embezzlement of *partnership funds* is that in taking partnership property, a partner would not be taking the property of another. Exactly similar reasoning compels the conclusion that a *cotenant* is not taking property of another when he misappropriates funds of the *cotenancy*. If such conduct is to be deemed criminal, it must be made so by *new legislation* and not by an expansive construction of an existing criminal statute. However true it may be as stated by the majority that "Criminal pleading is no longer the technical thing it once was . . .", it remains the law that penal statutes are to be strictly construed: Act of May 28, 1937, P. L. 1019, sec. 58(1), 46 PS 558(1).

Assuming, but not conceding, the propriety of the majority's conclusion that the rules of law painstakingly developed in actions relating to real property are not to be followed in criminal cases, I find no precept of the criminal law which authorizes incarceration of a man for stealing his own money or money in which he has an interest. However gross defendant's violations of his duties as agent may have been, they were not criminal under any statute or rule of law of this Commonwealth. As I read this testimony in its entirety, it appears to me that this should be but a civil case in equity for an accounting, where equity's decree, if necessary, could be enforced *in personam*.

For this reason, I dissent. I would reverse the judgments of the learned courts below and order defendant discharged.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

There is no statute on our books which says that what George Bovaird did was a crime. In affirming the conviction in this case, the majority of this Court has taken an unprecedented, and, in my opinion, an unwarranted step. The majority opinion quotes Section 834 of the Criminal Code and italicizes certain words as follows: "Whoever, having received or having possession, *in any capacity or by any means or manner*, of any money or property, of any kind whatsoever,—" But the italicization should have gone further—"*of or belonging to any other person. . .*"

Who is the other person? The indictment mentions Carter and Company. If Carter & Company were a corporation and as such an artificial person apart from the persons who owned the stock, the indictment would be valid, but Carter & Company is not a corporation or another person: It is a cotenancy, and a cotenancy is *not* separable from the members who compose it. Our law books are filled with statements to the effect that a co-tenant is a co-owner of all the property which is the subject of the co-tenancy.

The majority opinion says: "It is argued by the appellant that as a cotenant of Carter & Company he could not fraudulently convert or embezzle property of the cotenancy in all of which he had an undivided part ownership. Much of the argument in this connection relies on the theory of the law of cotenancy as applied to real property in the civil law. The criminal law is not controlled by the civil law. . . A private wrong when made a criminal offense becomes a public wrong." But the majority fails to note that reference *must* be made to the civil law in order to ascertain what interest the defendant had in the proceeds of the co-tenancy and thus determine whether a crime was committed when he accepted part of those proceeds.

It is true that a private wrong when made a criminal offense becomes a public wrong, but there has been no adjudication that what Bovaird did *was* a private wrong, but, assuming, arguendo, that it was, no criminal statute has made that private wrong a crime.

Instead of treating the civil law as of little consequence in this case, we are compelled to go to the civil law *absolutely* and *primarily* to establish the rights of the parties. One cannot steal from oneself, so that if Bovaird was entitled in law to draw from the co-tenancy assets, no crime has been committed. That is fundamental.

An examination of the civil law on the subject discloses *eo limine* that the "relationship of tenancy in common does not create, even by implication, the relation of principal and agent, and does not, of itself, make the cotenants partners"; 62 C.J. 419, Sec. 22; *Caveny v. Curtis, et al.,* 257 Pa. 575-580, 101 A. 853.

The majority opinion goes on to say that: "The defendant's status, therefore, was not merely that of a tenant in common as the relationship ordinarily arises by operation of law. . . Under it (the agreement) he became a co-owner but he primarily became the agent for the other co-owners. . . It was by virtue solely of his employment as agent and not by reason of his right as a cotenant that he came into possession of the monies which he was charged with converting or embezzling. He had no immediate right of possession as cotenant to these monies received qua agent." Here the majority would ignore the defendant's status as co-owner. As a cotenant of Carter & Company and therefore in possession of all of its property, George Bovaird was a principal, not an agent. As he was a cotenant and therefore owner of an undivided interest in the entire property he could not be an agent for himself. He could not be principal and agent at the same time.

The only description of the defendant as agent in the cotenancy agreement is that oil runs were to be credited in the pipe line to George Bovaird, Jr., as agent. The agreement did not provide that oil which would be produced from the lease operated by the cotenancy should be delivered into the pipe lines to the separate account of each of the cotenants, but rather it was to be delivered in the pipe lines to the credit of the cotenancy, and as someone necessarily was required to receive and receipt for the production, George Bovaird, Jr. was designated as agent. But that does not mean that his conduct of the business was not in the capacity of a co-tenant. The oil in the pipe lines, converted into cash and placed in the bank account of Carter & Company as provided in the agreement, was as much the property of the cotenancy as the original leaseholds.

Mills on "Law of Oil and Gas" page 263, sec. 175, Mills states: "Tenants in common of land who have executed a joint lease thereon are tenants in common in the royalty."

Since the defendant therefore was not a mere agent he could not be held guilty of embezzlement under Section 824 of the Act of 1939, 18 P.S. 4824.

Nor could the defendant be held guilty of fraudulent conversion of the tenancy property because the rule is hoary with age that each tenant has an equal right to the possession of the whole. That rule is stated in 62 C.J., sec. 30, p. 423, as follows: "A tenant in common has an interest in the possession of every part of the property, and from the nature of the estate must necessarily be in possession of the whole and has the right to occupy the whole of the common property and every part thereof, and cannot be ejected for occupying more than what would be his share of the premises on partition; nor can the rights to possession

of the premises, which all tenants in common of the property are entitled to as between themselves, be affected by the acts of one dispossessing another by force or fraud." Thus it can be seen that the co-tenant's right to the possession of the entire subject matter of the cotenancy is so strong and lasting that even where he takes possession of more than his proportionate share of the property he cannot be evicted therefrom. Nor was he, under the common law, liable for any rent for such use and occupation of more than his share. See *Kline v. Jacobs,* 68 Pa. 57, where this Court said: "But neither at common law nor under any statute could assumpsit for use and occupation be maintained upon the mere occupation, though it might be shown to be permissive. *Each tenant has an equal right to the possession of the whole,* and without an express contract to pay rent, account was the only remedy under the statute of Anne." (Emphasis supplied.)

Section 62 of C.J., sec. 26, p. 421, declares: "Each tenant in common is equally entitled to the use, benefit, and possession of the common property, and may exercise acts of ownership in regard thereto. . ."

The majority opinion states that the defendant "cannot escape criminal liability by doffing the wrap of agency, a garment of his own making, and donning the cloak of cotenancy with its fictional legal attribute."

Cotenancy is not a legal fiction. From the chambers of Sir William Blackstone, it has moved unquestioned down the stone corridors of time in all its dignity, clarity and authority. In ignoring its precise and never-heretofore-questioned attributes of wholeness and indivisibility, the majority is doffing its judicial robes and donning the raiment of a legislator. The majority here is acting as the General Assembly of the Commonwealth of Pennsylvania, which it has no right to do.

It is creating law by judicial fiat, which is completely beyond the scope of its constitutional authority. This constitutes ex post factoism which has no place in a land of laws.

Once we depart from the unequivocal statutory mandate (Act of May 28, 1937, P. L. 1019, 46 PS Sec. 558), that criminal statutes are to be construed *strictly*, we have opened the door not only to loose prosecution but to vindictive *persecutions*. If Bovaird's conduct was improper but the Criminal code does not cover that conduct, it is for the Legislature of the Commonwealth to supply the deficiency, not the courts. In the highly complex transactions involved in business life, business men have the right to know with precision what the criminal law is, for if non-prohibited acts can by construction become criminal acts, legitimate business will have been dealt a staggering blow. It is not right or salutary to the commercial interests of America that business men should have to operate under the shadow of a *possible* court interpretation which will declare their innocent acts criminal. Other states have not permitted that shadow to fall, as we shall see later.

The majority opinion seeks to distinguish the case of *Commonwealth v. Mitchneck*, 130 Pa. Superior Court 433, but it seeks in vain. It cannot be questioned that Mitchneck owed his employe a certain sum of money which he failed to pay to him and failed also to pay to the grocer to whom the employe owed money. Mitchneck thus, in effect, temporarily withheld money owing to his employes, but the Court held that this did not constitute fraudulent conversion.

The principle expressed by the Superior Court in that case applies precisely to the facts at bar when it said: "The words of the statute, 'money or property . . . which any other person, firm or corporation is entitled to receive and have', does not refer to money *owing* an-

other, but to money or property the title to and ownership of which is in another; it is another form of expressing money or property belonging to another."

In the case at bar Bovaird may owe money, but he has not fraudulently converted it under the statute.

In *Com. v. Overheim*, 106 Pa. Superior Ct. 424, 162 A. 475, the Superior Court said: "The Act of May 18, 1917 makes the fraudulent conversion of property a misdemeanor, but it is essential that the property at the time of sale or conversion shall have *belonged to another.*" (Italics supplied.)

As cotenant the title of the property of Carter and Company was as much in Bovaird as it was in the names of the cotenants. In *Commonwealth v. Cavanaugh*, 159 Pa. Superior Ct. 113, 116, the Superior Court said: "Of course one may not be convicted of fraudulent conversion if title and ownership of the property is in him."

In *Commonwealth v. Schuster*, 158 Pa. Superior Ct. 164, the Superior Court said: "The gravamen of the offense of fraudulent conversion is *the withholding of the property of another* with the intent to defraud that other, or to deprive him of the use and benefit of his property and to convert or apply the same to defendant's own use or benefit as against the owner." (Italics supplied)

Wharton's Criminal Law, 12th Ed., Vol. 2, sec. 1162, declares at page 1479: "Where there are joint tenants or tenants in common of a personal chattel, and one of them carries away and disposes of it, this is no larceny; there is, in fact, no taking, for he is already in possession; it is merely the subject of an action of account, or bill in equity."

It will be recalled that in the cotenancy agreement, Bovaird was given plenary power to operate the property of the cotenancy with "as full and ample authority

and unrestricted power as if he were the sole owner thereof."

The matter of agency of George Bovaird has been overstressed. He was referred to as agent only once in the agreement, as already indicated, and that for a specific purpose entirely unrelated to the question before us. He was never an agent in his relation with his brother co-tenants. They were all principals and no one was an agent to the other. And, least of all, was Bovaird an agent of Carter & Company, which, as shown, was not a corporation but a cotenancy. Bovaird was not an agent but a managing cotenant. As a co-owner of the property, Bovaird could not fraudulently convert what belonged to himself.

That the Commonwealth itself was not too sure of its ground in bringing this prosecution is evidenced by the fact that it returned eleven indictments against Bovaird but had to abandon four of them because the defendant was charged with fraudulent conversion of partnership property and of course, Carter & Company was no partnership. He was even indicted on the charge of embezzlement for receiving his own salary! And this indictment had to be withdrawn.

In 2 C. J. S., sec. 2(a), Page 1026, we find: "Whether as between the parties their relationship is one of agency depends on their relations as they in fact exist under the agreement or acts of the parties, and the question is not governed by the stipulations of the parties; and the parties cannot, where the relationship is in fact one of agency, change its nature by declaring that it is not an agency, nor can they, by calling their relations one of agency, make it so when it is not so in fact. Whatever the precise relationship between the parties may be, the relation of principal and agent does not exist between them in the absence of any essential element of such relationship."

I regard this whole prosecution as an attempt through criminal courts to collect a civil debt, a procedure which has always been abhorred by the courts, and to which we should not grant the remotest sanction. The transactions which resulted in the indictments in this case were all done openly. There was on the part of Bovaird no clandestine withdrawal of funds, no concealing of assets. It is very clear that it was understood that any one of the co-tenants could make withdrawals because it was understood that there would be a final accounting, and the debts and credits would be adjusted at that time. For instance, in 1936 John Carter withdrew $5,000 and Mrs. Carter withdrew $2500. In 1938 Mrs. Carter was in the hospital and a check was drawn in the amount of $4000 to pay for hospital bills. Mrs. Carter received $3,000 in the nature of an advance in 1939 and then additional amounts totaling $9500. The co-tenancy employed a bookkeeper who made entries of all these withdrawals. The books were examined by the Internal Revenue Department at various times for income tax purposes. John J. Carter, one of the original co-tenants, and George Christie Bovaird, who inherited Mrs. Bovaird's share in the co-tenancy, both testified that they were aware of the withdrawals made by the defendant and acquiesced in those withdrawals.

The two indictments charging embezzlement were drawn under Section 824 of the Act of 1939, 18 PS 4824, which states: "Whoever, being a banker, broker, attorney, merchant or agent, and being intrusted, for safe custody, with the property of any other person, and, with intent to defraud, sells, negotiates, transfers, pledges, or in any manner converts or appropriates to or for his own use or the use of any other person, such property, or any part thereof, is guilty of embezzlement. ." But the indictments fail to assert the indispen-

sable element of *intent to defraud* and should have been quashed on that ground alone. These indictments, after noting that Bovaird was entrusted with "money, accounts and properties belonging to Carter and Company," add "of which Beth M. Putnam was entitled to have a one-half share of interest or interest thereof," but this specifically mentioning Mrs. Putnam does not change the nature of the co-tenancy. George Bovaird, Jr., is still an owner and still cannot be charged with embezzling from himself. George Bovaird, Jr., cannot be an agent of Mrs. Putnam. This Court said in *Caveny v. Curtis,* 257 Pa. 575-580, 101 A. 853: " 'Under ordinary circumstances neither tenant-in-common can bind the estate or person of the other by any act in relation to the common property, not previously authorized or subsequently ratified, for *cotenants do not sustain the relation of principal and agent to each other,* nor are they partners.' "

In 62 C. J., 419, sec. 22, the general rule appears: "The respective rights of tenants in common are of a legal, and not of an equitable, nature. The relationship of tenancy in common does not create, even by implication, the relation of principal and agent, and does not, of itself, make the cotenants partners."

The amount involved in the two indictments on embezzlement was $2,000. It was not shown at the trial that this sum was embezzled from Mrs. Putnam. And we know that Bovaird could not have embezzled from Carter & Company, because he was a proprietor entitled, with all the other co-tenants, to all the assets of the co-tenancy.

Since the defendant was neither banker, broker, attorney or agent who was entrusted with the property of any other person, he cannot be guilty of embezzlement.

Since the defendant had the right to possess the property in question, he was not possessing property "of or belonging to any other person" and therefore cannot be held guilty of fraudulent conversion.

In Burdick—Law of Crime, Vol. 2, Page 283, Sec. 517, we find the statement: "If the property is owned by two or more persons, such as joint-tenants or tenants in common, no one of such owners can commit larceny from the others because all of them are equally in possession."

In *State v. Kent,* 22 Minn. 41, 21 Am. Rep. 764, the opinion of the Supreme Court holds: "Section 23, ch. 95, Gen. St., enacts that 'if any officer, agent, clerk, or servant, of any incorporated company, or if any clerk, agent, or servant, of any private person, or any co-partnership, . . . embezzles, or fraudulently converts to his own use, . . . without consent of his employer or master, any money or property of another, which has come to his possession or is in his care, by virtue of such employment, he shall be deemed to have committed larceny.'

"To sustain an indictment under this section of the statute, the money or property charged to have been embezzled, or fraudulently converted, must be the money or property of another than the person indicted. The defendant was collector of pew rents for a church corporation, and acted as such, under a special and express agreement, by which, as compensation for his services, he was to have 'five per cent. of all the pew rents, no matter who collected them.'

"The effect of this agreement was to vest in defendant an undivided one-twentieth interest in the rents collected, and to that extent to make him an owner of the same jointly with the corporation. In other words, the rents collected were not the money or property of the corporation, but the joint property of the corporation

and defendant. They were, therefore, not the property of another than the defendant. It follows that the defendant is not properly indictable, under the section of the statute before cited for his alleged embezzlement and fraudulent conversion of the same, or any part thereof. Holmes's Case, 2 Lewin, 256, cited 2 Archbold Cr. Pr. & Pl. 569, note: . . . Com. v. Stearns, 2 Met. 343, 349; Com. v. Libbey, 11 Met. 64; Com. v. Foster, 107 Mass. 221; 2 Bish. Cr. Law, §355, 356.

"This conclusion practically disposes of the case in defendant's favor."

*McElroy v. People,* 202 Ill. 473, 66 N.E. 1058, was a case under a statute similar to the statute in *State v. Kent,* supra. After quoting the statute, the Supreme Court of Illinois said: "By this statute, in order to constitute the crime of embezzlement the fraudulent conversion must be of the property of another. If the plaintiff had a right to deduct her commissions from the gross amount collected, then to that extent the money belonged to her,—*that is, she and the company owned the gross sum jointly.* The law is, that where a defendant has an interest in the property or money alleged to have been fraudulently converted to his or her own use there can be no conviction of the crime of embezzlement. (10 Am. & Eng. Ency. of Law, 985, and cases cited in note 7.)

"In the case of State v. Kusnick, 45 Ohio St. 535, [15 N.E. 481, 4 Am. St. Rep. 567,] the court said: 'It is true that at common law, to constitute larceny, the thing alleged to have been stolen must be the property of another person than the offender. It is also true that the statutes of nearly all the States which undertake to define embezzlement, require that the subject of the offense shall be shown to be property of another; and this has almost universally been construed to mean that it must be wholly the property of an-

other." (The Court then refers at length to the case of *State v. Kent,* supra)

The Court said further: "The only evidence of a criminal intent is the inference to be drawn from the act itself. She at no time denied or attempted to conceal the indebtedness."

In this connection it will be noted that the defendant Bovaird at no time denied or concealed the indebtedness, but it is a matter of record that at all times the books of the cotenancy disclosed the indebtedness of this defendant.

In *Commonwealth v. Novick,* 142 N.E. 771, the Supreme Judicial Court of Massachusetts said at Page 771: "At common law it was ordinarily held that a general partner could not be convicted of larceny or embezzlement for appropriating to his own use money which came into his possession by virtue of his being such partner and joint owner, because it was not 'the property of another.' 31 L.R.A. (N.S.) 822, note, and cases cited; Gary v. Northwestern Mutual Aid Association, 87 Iowa, 25 53 N.W. 1086; State v. Butman, 61 N.H. 511, 60 Am. Rep. 332. See Commonwealth v. Bennett, 118 Mass. 443. As to the unauthorized conversion of the funds of benevolent and fraternal organizations by their fiscal or managing agents, see 14 Ann. Cas. 725, note. State v. Kusnick, 45 Ohio St. 535, 15 N.E. 481, 4 Am. St. Rep. 564; People v. Mahlman, 82 Cal. 585, 23 Pac. 145. It was doubtless to exclude such a defense that our Legislature enacted the Statutes 1884, c. 174, and 1886, c. 328 (now G.L. c. 266, §58, 59). By the express terms of said sections 58 and 59 an officer of a voluntary association or society who fraudulently converts its money, goods or property, which has come to his possession by virtue of his office, is made guilty of larceny, 'although he is a member of such organization or voluntary association and,

as such, entitled to an interest in the property thereof."

In the *Novick* case it was necessary that a statute be enacted in order to exclude the defense that the accused was a joint owner, and, therefore, could not be indicted for larceny or embezzlement. It will also be noted that the statute which Illinois enacted specifically provided that an officer of a voluntary association or society who fraudulently converts its monies, etc., is made guilty of larceny "although he is a member of such organization or voluntary association and, as such, entitled to an interest in the property thereof."

It is my earnest belief that a great injustice is being done this defendant in declaring him criminally responsible for an act which, according to the law as I see it, was not a crime when committed. But an even greater injustice is being done him by refusing a new trial on the state of the record.

The defendant desired to show at the trial that the market value of the cotenancy was over $1,000,000, but the Trial Judge refused to permit this evidence. This was grave error.

It is a simple matter of common sense that if a person is charged with stealing $100 and he can show that he possesses $100,000, this would tend to negate the element of criminal intent without which there can be no crime.

Much was made at the trial that Bovaird had withdrawn some $197,000 from the cotenancy, but he was criminally charged only with taking $9500. It would not be unreasonable to suppose that the jury, on the evidence, found Bovaird *morally* guilty of taking $197,-000, but if the jury had known that the value of the property was over $1,000,000, the figure of $197,000, as impressive as it is, would have been reduced, in their calculations, to a smaller comparative size.

The element of sympathy for the loser in financial transactions is inevitable, and I would not say that it is improper, but in a trial at law that sympathy should at least be intelligently exerted, and how can it be so exerted when the jury is deprived of knowledge of all the facts?

It was shown at the trial that there were judgment liens against the cotenancy property in the amount of $300,000. Here again, if the defendant had been permitted to show the value of the whole property to be $1,000,000, the $300,000 debt would not have influenced the jury to the extent that it otherwise undoubtedly did.

This point was squarely ruled on by the Superior Court in the case of *Commonwealth v. Hazlett,* 14 Pa. Superior Ct. 352, 369, 370. There, the defendant banker was charged with embezzlement. At the trial he endeavored to show the assets of the bank at the time it closed its doors, for the purpose of repelling the charge that he knew the bank was insolvent. The Trial Court refused the offer as irrelevant. The Superior Court reversed the conviction and remanded the case for a new trial. In its opinion, the Superior Court said: "The evidence embraced in the offer which is the subject of the tenth assignment might not shed any light upon the question whether the defendant had sufficient assets at the time he received this deposit to meet and pay his liabilities in the regular course of business, as counsel for the commonwealth truly say, but we are clearly of opinion, that, if believed by the jury, *it would have had a legitimate tendency to repel the inference that it was because of his knowledge or belief that he was insolvent that he closed his bank.*"

The Court said also: "Whenever the motive, intention or belief of a party charged with a crime is in issue, it is competent for such party to testify directly

upon that point, and also to the *facts and circumstances accompanying an act, which reasonably tend to repel an unfavorable inference which might be drawn from the act if unexplained.*" (Emphasis supplied.)

In the case before us, the motive or intention of George Bovaird was strictly in issue. And it was certainly relevant to show, in his defense, that there could not have been any intention to deprive the other cotenants of money due them, since the assets were excessively adequate to meet all their demands. Not only would the $1,000,000 figure discharge all obligations, but it would demonstrate that it included an amount in excess of whatever share Bovaird would be entitled to in the eventual distribution.

The failure to let the jury have this highly relevant evidence was a mortal blow to the defendant's case because the jury could have believed, as it undoubtedly did, that Bovaird's withdrawals represented a taking of moneys due the other cotenants, whereas, on the basis of a $1,000,000 valuation, this was not true. The jury could still have believed, with the introduction of the $1,000,000 figure that Bovaird was guilty, but the defendant would have had his complete day in court, which, under the circumstances as I view them, has now been denied him.