J-S28021-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                   :  PENNSYLVANIA
                                   :
           v.                      :
                                   :
                                 :
DONALD NEWSOME  :
                                 :
          Appellant        :  No. 2319 EDA 2023

Appeal from the Judgment of Sentence Entered August 4, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0002062-2022

BEFORE: STABILE, J., MURRAY, J., and LANE, J.

MEMORANDUM BY MURRAY, J.:          **FILED AUGUST 30, 2024**

Donald Newsome (Appellant) appeals from the judgment of sentence imposed after the trial court convicted him of three counts of rape by forcible compulsion and one count each of rape of a child and endangering the welfare of children (EWOC).[1] We affirm.

The charges arose from allegations that Appellant raped the minor Complainant (who was 15 years old at the time of trial) on three occasions. *See* N.T., 4/4/23, at 21. Appellant had a five-year romantic relationship with Complainant's mother (Mother), when Complainant was between the ages of 5 and 10. *Id.* at 24-26, 59. During that time, Mother, Complainant, and Complainant's siblings resided with Appellant in Chester, Pennsylvania. *Id.*

---

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3121(c), 4304(a)(1).

at 25-26, 59. Complainant considered Appellant to be her stepfather. *Id.* at 22-23. When Mother and Appellant ended their relationship, Mother moved to Delaware with her children. *Id.* at 29, 59. However, Mother allowed Complainant and her siblings to visit Appellant, with whom they often stayed overnight. *Id.* at 29-30, 46-47, 61.

After about two years of these visits, when Complainant was 11 or 12 years old, she noticed Appellant began treating her differently. *Id.* at 28-29, 32. Complainant testified Appellant "would give me more praise and more gifts and stuff like that, more than he would with my other siblings." *Id.* at 29. Complainant testified Appellant also began to touch her: "[Appellant] would like … brush my arm sometimes or … every time he would talk to me, … [he would] just start tapping my leg or something…." *Id.* at 31. Complainant asked Appellant why he had "to poke me or touch me every time you're talking to me? [Appellant responded,] that's just how I talk." *Id.* at 32.

Complainant testified that, a few months later, "one night … I felt like I was going to kill myself, and … [Appellant] kind of used that as an advantage, [saying] I want you to sleep in my room because … I don't trust you [not to harm] yourself." *Id.* Complainant testified Appellant made her sleep in his room, and "[t]hat whole night I was in there, he just kept laying up against me and touching me and like rubbing on my leg…." *Id.* at 32-33. Complainant testified Appellant touched her legs and breasts. *Id.* at 36. She stated she

was "shaking, scared," and "didn't know what to do. I just sat there and left in the morning." *Id.* at 33.

Complainant testified regarding a subsequent occasion:

I was in my room one day and we were watching TV. And [Appellant] just kept, you know, [being] like really touchy. And I kept moving away from him, and I'm just like—in my head, I'm like okay, I don't know what's happening, but like, I don't … want [this]. So then I go lay down …, and he laid down too. And he started touching on me how he [had been earlier] … that night. And, I started getting squeamish. [I kept] moving my body and stuff. And then [Appellant] like laid me down on my back and … held my hands back and started forcing his penis into me…. I didn't know what to do at that point. Like I was just also in shock again. I just didn't know what to do at that point.

*Id.* at 36-37. Complainant confirmed "[Appellant's] penis went into my vagina," and Appellant eventually ejaculated on the bed. *Id.* at 37, 39, 44. Complainant experienced pain, and afterward discovered blood in her genital area. *Id.* at 39-40. She testified, "I got into the shower and was just crying in the shower for like an hour." *Id.* at 40. She indicated she did not feel safe telling anyone what happened. *Id.* at 41.

Complainant testified a second rape occurred "a year or two" after the first, when she was about 13 years old. *Id.* at 41, 46. She stated,

I think we were in [Appellant's] room again if I'm not mistaken…. And it was like late at night. [Appellant] asked me to go get him a snack, but it was just like a usual thing, so I thought nothing of it. And when I went in [his room], he's like come here, just sit down and watch TV with me. So I was like okay, whatever…. [B]y this time, I totally forgot about the [first] situation. I left it alone and like I tried to erase it out of my mind. And he's like come on, just sit down with me and watch TV. So I did. I sat there, watched TV, and I end up falling asleep. And when I was [a]sleep, I kept feeling something like touch my leg. … And then I felt my pants

- 3 -

moving in my sleep, so I kind of woke up. And he like was …
trying to pull my pants down. And by the time he got them down,
… I was just staring at him…. [I]n my mind, I'm just like what am
I supposed to do? Because if I move, what is he going to do?

*Id.* at 41-42. Complainant testified Appellant "started … rubbing my butt.

And then his hands went into … my pants and … went to my vagina…. [A]nd

he started like messing with my vagina." *Id.* at 43. Complainant continued:

And then after that, … I guess once he felt me moving, … he
stopped. And I turned around … [and] I went back to sleep. And
next thing you know, he was over top of me. And [the] same
thing that happened last time happened. Like he started holding
my hands back, and I'm sleepy. Like I'm half [a]sleep. I don't
know what's going on. He pulled my hands back and then pulled
my pants off and of course just put his penis into my vagina.

*Id.* at 43-44. Complainant testified she experienced pain, and Appellant

ejaculated on her leg. *Id.* at 44. Afterward, Complainant "got in the shower

and I was just in the shower crying." *Id.* at 44-45. Complainant testified she

did not feel safe telling anyone what happened. *Id.* at 45. Remembering

times when Appellant had hit her Mother, Complainant thought, "I don't want

that to happen to me…." *Id.* at 45.

Complainant testified that "a few months" after the second rape, she

snuck out of Appellant's house to see friends, and Appellant caught her

returning to the house. *Id.* at 47. Complainant did not want Appellant to tell

her Mother, and he assured her he would not. *Id.* at 47-48. Later that night,

Appellant entered Complainant's bedroom while she was sleeping and said,

"I'm just checking on you." *Id.* at 48-49. Complainant testified Appellant laid

on her bed and started touching her butt:

[H]e's rubbing my butt [and] talking into my ear, talking about you know you['re] in trouble, … he kept saying you're in trouble. So I'm just like sitting there. I'm like oh, my gosh…. I'm just like here we go. Like I don't want this to happen again. And I was just scared…. I feel like he's going to tell my mom … [and] if he tells my mom, … I'm going to be in deep trouble…. [S]o he just started touching me again. He flips me over, and he puts his penis in my vagina again. And this time I'm just thinking … what if I say no? I'm going to get in trouble. If I say yes, I'm going to get in trouble…. So then by the time he got done, … I was just still … overthinking it…. [I]f I try to tell my mom that he did this, now [my mom will say], you're trying to get back at [Appellant] for telling me [you snuck out of the house].

*Id.* at 49-50. Complainant testified Appellant "left the room and I was just laying on my bed and I was crying. I went to go call my mom, but then I just … hung up because I was just scared." *Id.* at 50.

Complainant testified that Appellant once told her, "[I]f you ever tell anybody, we['re] both going to get into trouble." *Id.* Complainant "remember[ed] saying to [Appellant] on numerous occasions like you're supposed to be my father figure, and you're hurting me." *Id.* at 50-51. According to Complainant, Appellant responded by saying, "well, stuff can go back to normal and I can tell your mom everything." *Id.* at 51. Complainant feared Appellant would tell her Mother she had done "a lot [of things] that I know I wasn't supposed to do." *Id.* Complainant testified,

[i]n my childhood mind, I'm just … scared. I don't know what to do. I don't know what to pick. I don't know what to say. So I just [] got quiet after that and I cried and cried and cried and cried and coped by like smoking [marijuana] and doing things I wasn't supposed to do anyway.

*Id.*; *see also id.* at 51-52 (Complainant's testimony that Appellant offered her marijuana and alcohol).

Complainant began asking her friend, N.M., to stay with her at Appellant's house so she would not be alone with Appellant. *Id.* at 53. Complainant eventually told N.M. about the rapes. *Id.* at 53-54. N.M. testified she offered to call a family member who was a police officer, but Complainant "didn't want [N.M.] to tell anybody because … she was scared to say something because of what would happen." *Id.* at 101.

N.M. also testified she confronted Appellant and told him what Complainant had disclosed to her. *Id.* at 101-02. According to N.M., Appellant initially "said [N.M.] was lying, [Complainant] was lying." *Id.* at 102. N.M. testified the conversation then "escalated" to Appellant saying

> It's not his fault, it was [Complainant's] fault. And I asked him, I said how is it an 11-year-old's fault that she's getting touched by you? … And he said it's not my fault, she started it.

*Id.* at 103.

Complainant testified that one day she was talking with her Mother about a sexual assault Mother had previously experienced, when Complainant "broke down crying" and told Mother what Appellant did to her. *Id.* at 55. Complainant and Mother thereafter reported the incidents to police.

On October 20, 2021, Officer Jose Alvarez of the Chester Police Department conducted a "minimal facts interview" with Complainant, who gave a handwritten statement. *Id.* at 122; *see also* Defense Exhibits 7 and

8.     Detective Nicole Young, an officer in the Special Victims Unit of the Delaware County District Attorney's Office, took over the investigation from the Chester Police Department.  N.T., 4/4/23, at 122.  Detective Young testified that a "minimal facts interview" is police protocol when dealing with a child victim:

> A minimal facts interview is to just basically find out a very minimal amount of information to see if a crime had occurred.  We do not want to completely interview the child and get every single detail and every single incident that occurred.

*Id.* at 124-25.  Detective Young continued:

> After we perform a minimal facts interview, if in fact there is, we feel, enough that there may be a case or that a crime did occur, we then schedule a forensic interview.  A forensic interview [is] done so that the child can be interviewed by a trained child interviewer.  It is videotaped.  These [interviewers] are specially trained, … and we try to interview every single child that way.

*Id.* at 125-26.   Detective Young testified that Complainant underwent a videotaped forensic interview at the Delaware County Child Advocacy Center.

*Id.* at 126; *see also* Defense Exhibit 9.

On May 24, 2022, the Commonwealth filed a criminal information, charging Appellant with three counts each of rape by forcible compulsion, rape of a child, EWOC, and unlawful contact with a minor;[2] and one count of involuntary deviate sexual intercourse with a complainant less than 16 years

---

[2] 18 Pa.C.S.A. § 6318(a)(5).

old.[3]  Appellant waived his right to a jury trial, and the matter proceeded to a non-jury trial on April 4-5, 2023.

At trial, defense counsel attempted to impeach Complainant with alleged inconsistencies between her trial testimony, her preliminary hearing testimony, and her prior statements to Officer Alvarez and the forensic interviewer.  *See* N.T., 4/4/23, at 73-87.  Defense counsel accused Complainant and N.M. of "concoct[ing] this scheme" to "falsely accuse [Appellant] of raping [Complainant]" in order to get "revenge," after Appellant claimed the girls had taken his pellet gun, phone, and money.  *Id.* at 69-72 (defense counsel's cross-examination of Complainant); *see also id.* at 113, 118 (cross-examination of N.M.).  Complainant and N.M. denied defense counsel's accusations and insisted they told the truth.  *See id.* at 69-72, 113, 118.

Appellant presented testimony from his former girlfriend, Janice Williams, who had resided with Appellant from 2018 to 2020.  *Id.* at 135.  Ms. Williams testified she never observed anything inappropriate or unusual between Appellant and Complainant.  *Id.* at 136.  Appellant also presented testimony from Latoya Bowers and Aaron Bowers, his niece and nephew, who testified that Appellant had a reputation in the community for being peaceable and nonviolent.  *Id.* at 139-40.

_____

[3] 18 Pa.C.S.A. § 3123(a)(7).

At the trial's conclusion, the trial court convicted Appellant of three counts of rape by forcible compulsion and one count each of rape of a child and EWOC. *See* Trial Court Opinion, 11/30/23, at 40 (finding Complainant testified credibly that Appellant raped her three times, including once when she was less than 13 years old). The trial court acquitted Appellant of the remaining charges.

On July 24, 2023, the trial court imposed an aggregate sentence of 7 to 20 years in prison. Appellant's rape convictions also rendered him a Tier III offender under the Sexual Offender Registration and Notification Act, subjecting him to lifetime registration and reporting requirements. *See* 42 Pa.C.S.A. §§ 9799.14(d)(2), 9799.15(a)(3).

Appellant filed a timely post-sentence motion, claiming the verdict was against the weight of the evidence. The Commonwealth filed a motion for reconsideration of sentence, arguing that Appellant's rape of a child conviction required a 10-year mandatory minimum sentence. On August 4, 2023, the trial court granted the Commonwealth's motion and resentenced Appellant to an aggregate 10 to 20 years in prison. On August 10, 2023, the trial court denied Appellant's post-sentence motion.

Appellant timely appealed. Appellant and the trial court have complied with Pa.R.A.P. 1925. Appellant presents two issues for our review:

> 1. Whether Appellant's conviction for three counts of Rape by Forcible Compulsion, and one count each of Rape of a Child and [EWOC] should be vacated, for insufficient evidence, where the Complainant's repeated contradictory testimony regarding the

circumstances surrounding the incidents of abuse and the type of sex that occurred, made the Complainant's testimony so unreliable that the court's verdict finding Appellant guilty, was based on mere conjecture, not reasonable doubt?

2.     Whether Appellant's conviction for three counts of Rape by Forcible Compulsion, and one count each of Rape of a Child and [EWOC] should be vacated because it was against the weight of the evidence, where the Complainant offered contradictory testimony for each of the three incidents of alleged sexual assault, as she not only changed the circumstances surrounding the incidents of abuse, but in many instances alternated between alleging vaginal intercourse and oral sex, and Appellant presented character evidence attesting that he had a reputation in the community for being peaceable and non-violent, which renders the trial court's verdict of guilty so contrary to the evidence as to shock one's sense of justice?

Appellant's Brief at 5 (issues reordered).

In his first issue, Appellant argues the Commonwealth presented insufficient evidence to support his convictions, as Complainant's "varying accounts of rape and sexual abuse" were "so inconsistent and contradictory as to present [the fact-finder] with no basis for a finding except for mere conjecture." *Id.* at 25. As Appellant failed to identify a challenge to the sufficiency of the evidence in his court-ordered Pa.R.A.P. 1925(b) statement, this issue is waived.[4] *See Commonwealth v. Bonnett*, 239 A.3d 1096, 1106

_____

[4] In Appellant's Rule 1925(b) statement, his formulation of this issue lacked the phrase "for insufficient evidence," which he added in his appellate brief. *See* Rule 1925(b) Statement, 9/15/21, ¶ 2; Appellant's Brief at 5. Accordingly, the trial court interpreted the issue as challenging the weight, rather than the sufficiency, of the evidence. Trial Court Opinion, 11/30/23, at 9-10. Failure to properly identify issues in a Rule 1925(b) statement results in waiver because the "absence of a trial court opinion poses a substantial impediment to meaningful and effective appellate review." *Commonwealth v. Smith*, 304 A.3d 35, 39 (Pa. Super. 2023) (citation omitted).

(Pa. Super. 2020) ("It is well-established that any issue not raised in a Rule 1925(b) statement will be deemed waived for appellate review.").

Even if it were not waived, Appellant's sufficiency claim would not merit relief. Ordinarily, a claim "[d]irected entirely to [a witness's] credibility … challenges the weight, not the sufficiency, of the evidence." *Commonwealth v. Palo*, 24 A.3d 1050, 1055 (Pa. Super. 2011). However, Appellant relies on *Commonwealth v. Bennett*, 303 A.2d 220 (Pa. Super. 1973) (*en banc*), in which this Court concluded that a witness's "testimony was so inconsistent and contradictory as to be insufficient to support a finding of [the defendant's] guilt." *Id.* at 220.

In *Bennett*, the defendant

> had been a passenger in [a] stolen automobile while it was being driven by one Harry Jones. Later [the defendant] had been found driving the vehicle in Philadelphia with Jones as a passenger. Jones, after denials, confessed to the automobile's theft and it was on his testimony that the Commonwealth relied in its proof of charges against defendant [for receiving stolen property]….
>
> Jones (who had been contradictory with respect to his own perpetration of the larceny) sought to implicate the defendant by giving several wholly different, conflicting and inconsistent versions of when and how he had told her that the car had been in fact stolen by him. On a previous occasion[,] Jones had denied he had ever conveyed to defendant knowledge of the car's theft. With each new version Jones would recant the previous one and protest that the newest version was in fact the true one. This situation presented the jury not with a mere conflict or contradiction in testimony which was reasonably reconcilable by them, but a situation falling within the rule: "a case should not go to the jury where the party having the burden offers testimony of a witness, or of various witnesses, which is so contradictory on the essential issues that any finding by the jury would be a mere guess. When the testimony is so contradictory on the basic issues

- 11 -

as to make any verdict based thereon pure conjecture the jury should not be permitted to consider it." **Commonwealth v. Bartell**, 136 A.2d 166, 172 (Pa. Super. 1957).

*Id.* at 220-21 (ellipses omitted; citation modified). The **Bennett** Court concluded that "[t]o grant a new trial would be vain in this case," because "no matter what [Jones] might say [in] a second trial, [his] testimony would stand impeached by [his] admissions in the record before us, and the court in good conscience would be bound to set aside a second conviction." *Id.* at 221 (quoting **Commonwealth v. Rex**, 24 A.2d 98, 124 (Pa. Super. 1942)).

In **Commonwealth v. Galloway**, 434 A.2d 1220 (Pa. 1981), our Supreme Court recognized **Bennett**'s limited application:

> [The a]ppellant's reliance on [**Bennett**] here is misplaced. "The **Bennett** principle is applicable only where the party having the burden of proof presents testimony to support that burden which is either so unreliable or contradictory as to make any verdict based thereon obviously the result of conjecture and not reason." **Commonwealth v. Farquharson**, 354 A.2d 545, 550 (Pa. 1976). The contradictions here were simply not of this magnitude. We are satisfied that there was sufficient evidence to enable the jury to find appellant guilty of the instant crimes beyond a reasonable doubt.

*Id.* at 1222 (citation modified); *see also Commonwealth v. Bibbs*, 970 A.2d 440, 445-47 (Pa. Super. 2009) (discussing **Bennett**'s limited application).

Here, our review discloses that Complainant's alleged inconsistent statements presented "a mere conflict or contradiction in testimony which was reasonably reconcilable by" the fact-finder. **Bennett**, 303 A.2d at 221. We observe that, despite some inconsistent details, each of Complainant's

- 12 -

statements described Appellant raping her on multiple occasions.[5] "The contradictions here were simply not of [the] magnitude" required to implicate *Bennett*. *Galloway*, 434 A.2d at 1222. Accordingly, Appellant's sufficiency claim is without merit.

In his second issue, Appellant argues the verdict was against the weight of the evidence. Appellant's Brief at 18-23. He maintains he is entitled to a new trial because the trial court's verdict was "so contrary to the evidence as to shock one's sense of justice." *Id.* at 20. "Clearly," Appellant asserts, "[Complainant] was not raped or sexually assaulted by Appellant in any manner, where [Complainant] wholly fabricated three separate instances of rape, [and provided] starkly contrasting and differing accounts each time she reported the alleged conduct." *Id.* Appellant argues Complainant "alleged a different set of facts each and every time she recounted the instances of alleged sexual abuse by Appellant to the authorities. Her proffered versions changed [as to] the type of sex [that occurred], and the totality of the circumstances surrounding the alleged instances of sexual abuse." *Id.* at 21.

Appellant notes Complainant told the forensic interviewer that, after the first rape, her underwear was soiled with blood. *Id.* at 10 (citing Defense Exhibit 9). At trial, Complainant denied making that statement to the forensic interviewer. N.T., 4/4/23, at 77. Complainant maintained her underwear was

---

[5] We address Complainant's alleged inconsistent statements more fully in our discussion of Appellant's weight claim.

not soiled with blood, but that she discovered blood when she wiped herself after using the bathroom. *Id.*

Appellant notes Complainant told the forensic interviewer that the second rape occurred after she got out of the shower. Appellant's Brief at 11 (citing Defense Exhibit 9). At trial, Complainant did not recall making that statement to the forensic interviewer, and maintained the rape began while she was sleeping. N.T., 4/4/23, at 40-45, 79-81.

Appellant also notes that Complainant's statement to Officer Alvarez described the second incident as involving forced oral sex, not vaginal sex. Appellant's Brief at 11 (citing Defense Exhibit 8). At trial, Appellant maintained the second incident involved both oral and vaginal sex:

> Q [Defense Counsel]: So, again, [Appellant] never subjected you to oral sex, isn't that true?
>
> A [Complainant]: He did. It's just that I totally forgot about that part of everything happening…. I erased a lot of stuff out of my mind[,] so I don't have to think about it, so maybe, yes, I forgot about me saying that because that is what happened.
>
> Q: Did you forget it or did you simply make it up the first time—
>
> A: I never made it up.
>
> Q: —about the oral sex?
>
> A: I never made it up.
>
> Q: And did you make it up this time about the vaginal sex?
>
> A: Never made it up.

N.T., 4/4/23, at 79.

Appellant further notes Complainant testified at the preliminary hearing that the third rape began while she was watching a movie, but she testified at trial that it began while she was sleeping. Appellant's Brief at 13 (citing N.T. (Preliminary Hearing), 4/25/22, at 32). When confronted about the inconsistency on cross-examination, Complainant maintained she had fallen asleep while watching a movie. N.T., 4/4/23, at 85-86.

Additionally, Appellant challenges Complainant's credibility by noting that she immediately told her Mother about an incident wherein Appellant "smacked" her. Appellant's Brief at 14-15 (citing N.T., 4/4/23, at 88-89). "Clearly," Appellant argues, "it strains credulity to believe that [Complainant] would tell her [M]other that Appellant hit her, but would not tell her [M]other that Appellant raped her three times!" *Id.* at 22. Appellant also points to alleged inconsistencies in Complainant's and N.M.'s testimony regarding whether Appellant or N.M. supplied the marijuana they smoked; whether they smoked marijuana with Appellant; and whether Appellant barred the girls from his house for allegedly taking his things. *Id.* at 13-15, 21.

Appellant argues Complainant's and N.M.'s testimony was "contradicted" by Ms. Williams's testimony that she never observed "sign[s] of sexual activity" between Appellant and Complainant. *Id.* at 22. Appellant also maintains Complainant's "[un]corroborated" allegations were "[c]learly" outweighed by his "unrebutted evidence" of his "good character" and reputation for being "a peaceable and nonviolent person." *Id.* at 22-23.

Our standard of review of a weight claim is well settled:

The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. A new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock its conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Williams*, 255 A.3d 565, 580 (Pa. Super. 2021) (citation omitted).

When a weight challenge "is predicated on the credibility of trial testimony, [appellate] review of the trial court's decision is extremely limited. Generally, unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review." *Commonwealth v. Bowen*, 55 A.3d 1254, 1262 (Pa. Super. 2012); *see also Commonwealth v. Wright*, 314 A.3d 515, 524 (Pa. Super. 2024) ("[I]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court."). Conflicts in the evidence or contradictions in testimony are exclusively for the fact-finder

to resolve. ***Commonwealth v. Sanders***, 42 A.3d 325, 331 (Pa. Super. 2012).

Further,

> [b]ecause the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination [as to whether] the verdict is against the weight of the evidence.

***Id.***; ***see also Commonwealth v. Sanchez***, 262 A.3d 1283, 1288 (Pa. Super. 2021) ("Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court."). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence." ***Commonwealth v. Weitzel***, 304 A.3d 1219, 1227 (Pa. Super. 2023) (citation omitted).

Here, Appellant's weight claim rests solely on Complainant's credibility. The trial court rejected the claim as "wholly misguided." Trial Court Opinion, 11/30/23, at 40. The trial court maintained it "objectively reviewed" the totality of the evidence and "ma[d]e discerning credibility and evidentiary weight determinations" in reaching its verdict. ***Id.*** Exercising its "exclusive fact-finding prerogative," the trial court "chose to believe [Complainant's] testimony that she was raped three times" by Appellant. ***Id.***

The trial court noted Complainant "unambiguously denied" that her allegations "were fabricated." *Id.* at 28. The trial court specifically credited Complainant's explanations for the inconsistencies between her trial testimony and prior statements. *Id.* at 28-34; *see also id.* at 33 (finding Complainant persuasively "offered reasoned explanations for those modest inconsistencies between her trial testimony and past statements….").

The trial court concluded that defense counsel was "wholly unsuccessful in his attempt to develop meaningful impeachment material" from Complainant's past statements. *Id.* at 29. The trial court found:

> Despite a most rigorous cross examination, [Complainant] recanted none of her [direct testimony] as to how on multiple occasions she was sexually victimized by [Appellant]. [W]hen directly accused by [defense counsel] of a wholesale manufacturing [of her allegations, Complainant] steadfastly in every instance denied the same without hesitation and/or equivocation.

*Id.* at 33 (citations omitted). The trial court "observed [Complainant's] demeanor to be appropriately persuasive" during her contentious exchanges with defense counsel. *Id.* The trial court found Complainant "exuded an understandable sense of being violated by [Appellant]" and "manifested … a quiet outrage" at her victimization, "all in an expected age[-]appropriate manner." *Id.*

The trial court also found Complainant lacked the "Machiavellian sophistication" which would have been necessary to "complete[ly] fabricat[e]" the allegations. *Id.* at 23. The trial court found Complainant did not have the

"mental maturity and foresight" to "manufactur[e]" certain details, such as Appellant telling her they would both get into trouble if she disclosed the abuse. *Id.* at 24; *see also id.* at 33 (finding Complainant lacked the requisite "sophistication" to fabricate the details of Appellant's "'grooming' behaviors"). Additionally, the trial court specifically found that Complainant's testimony outweighed the brief testimony of Appellant's character witnesses. *Id.* at 35-37.

Our review discloses the trial court's reasoning is supported by the record, and we discern no abuse of discretion in its rejection of Appellant's weight claim. The trial court properly made credibility determinations, and we are not empowered to re-weigh the testimony. *Bowen*, 55 A.3d at 1262. Accordingly, Appellant's second issue merits no relief.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/30/2024

- 19 -